**EXHIBIT 1**

1  TOWNSEND AND TOWNSEND AND CREW LLP
   MARK T. JANSEN (State Bar No. 114896)
2  BYRON R. CHIN (State Bar No. 259846)
   Two Embarcadero Center Eighth Floor
3  San Francisco, CA 94111
   Telephone: (415) 576-0200
4  Facsimile: (415) 576-0300
   Email: mtjansen@townsend.com
5          brchin@townsend.com

6  Attorneys for Plaintiff
   MYRA MARCELO

7

8

9

ENDORSED
FILED
SAN FRANCISCO COUNTY
SUPERIOR COURT

2010 OCT 12  AM 1: 05

CLERK OF THE COURT
BY:
        GLORIA BURK

CASE MANAGEMENT CONFERENCE SET

MAR 1 1 2011 10:00AM

DEPARTMENT 212

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF SAN FRANCISCO

UNLIMITED CIVIL CASE

| | |
|---|---|
| MYRA MARCELO, an individual,<br><br>Plaintiff,<br><br>v.<br><br>IVY VENTURES, LLC, a Virginia corporation,<br><br>Defendant. | Case No. **CGC-10-504554**<br><br>**VERIFIED COMPLAINT FOR DECLARATORY RELIEF, UNFAIR COMPETITION, AND INJUNCTIVE RELIEF**<br><br>**JURY DEMAND**<br>(Amount of Damages in excess of $25,000) |

        Myra Marcelo ("Ms. Marcelo" or "Plaintiff"), Plaintiff in the above-captioned action,

alleges the following facts and bases for her verified Complaint against Defendant Ivy Ventures,

LLC ("Ivy").  Plaintiff, a resident of the City and County of San Francisco, California, seeks

declaratory relief under California Code of Civil Procedure § 1060, injunctive relief under

California Business and Professions Code §§ 17200 *et seq.*, and damages regarding Defendant's use

and attempted enforcement in California of prohibited non-compete and non-solicitation of clients

clauses contained in Defendant's employment agreement with Plaintiff, a California employee and

resident, as these clauses are prohibited under California law.  Defendants' efforts to enforce these

prohibited clauses are unlawfully limiting the ability of Ms. Marcelo to engage in lawful

- 1 -

VERIFIED COMPLAINT FOR DECLARATORY RELIEF, UNFAIR COMPETITION AND INJUNCTIVE RELIEF

1    employment and competition in California.

2                           **NATURE OF THE ACTION**

3        1.    This action arises from the inclusion of prohibited terms and conditions (covenants

4    not to compete and to not solicit clients) by the Defendant in Plaintiff's contract for employment in

5    California. This action also arises from Plaintiff's actions to enforce these prohibited terms in the

6    Circuit Court of Henrico County, Virginia, so as to circumvent Business and Professions Code §§

7    16600 and 17200 *et seq.*, and thus use Virginia courts to nullify California's sovereignty and

8    directly contravene a California statute enacted over 100 years ago to protect the rights of California

9    workers, Business and Professions Code § 16600.

10       2.    Plaintiff asks the Court, pursuant to Code of Civil Procedure § 1060, to declare that

11   the prohibited terms and conditions are void and unenforceable in California, and that the inclusion

12   in the contracts and attempted enforcement of the prohibited terms and conditions constitute an

13   unfair business practice under Business and Professions Code §§ 17200 *et seq.* The Court is also

14   requested to declare other disputes that have arisen between the parties.

15                    **PARTIES, JURISDICTION AND VENUE**

16       3.    Plaintiff is a citizen and resident of California, having resided at 383 King Street,

17   Apt. 916, San Francisco, CA 94158 since May 2009.

18       4.    Plaintiff is informed and believes that Defendant Ivy is a Virginia limited liability

19   company with its principal place of business in Richmond, Virginia and that Ivy provides operating,

20   managing, marketing and consulting services to hospitals, diagnostic imaging facilities and other

21   outpatient services.

22       5.    This Court has subject matter jurisdiction over this action pursuant to Code of Civil

23   Procedure § 1060 and over the other California state law claims.

24       6.    Venue is proper in this forum under Code of Civil Procedure § 395.5 in that the

25   unlawful acts, obligations and liability that plaintiff alleges occurred and arose within this forum.

26       7.    This Court has personal jurisdiction over Defendant under California's long arm

27   statute because Defendant conducts business for clients in California, has entered and is currently

28   performing service contracts for its clients in California, and because Defendant reached out to

- 2 -

California to hire Plaintiff (and other California residents) to work at its California client locations, including, in the case of Plaintiff, at Seton Medical Center ("Seton") in Daly City, California.

### FACTUAL ALLEGATIONS COMMON TO ALL COUNTS

8.     Plaintiff is an adult citizen and resident in the city of San Francisco, California, a city in San Francisco County. Ms. Marcelo has over eight (8) years experience as a community educator and in sales and marketing from her previous career in the pharmaceutical industry and as a small business owner.

9.     Plaintiff incorporates by reference the facts set forth in the Declaration of Myra Marcelo in Support of *Ex Parte* Application for Order to Show Cause re Preliminary Injunction and Temporary Restraining Order, served herewith.

10.     Ms. Marcelo has never worked, lived, or resided in Virginia. Her only contact with Virginia at all times has been the fact that Ivy is based in Virginia.

11.     Ivy recruited, negotiated the terms of Ms. Marcelo's employment, and hired Ms. Marcelo in California on or about December 14, 2009. Ivy hired Ms. Marcelo to work as an on-site community educator and marketing representative at Seton Medical Center ("Seton") in Daly City, California.

12.     All of the recruitment, employment interviews and other actions leading up to Plaintiff's employment with Ivy occurred solely in California. Specifically, Ms. Marcelo responded to an advertisement for a Sales and Marketing position listed in the California section and within the San Francisco sub-section posted on the Medreps.com website that was posted on Ivy's behalf. Ms. Marcelo interviewed telephonically and in person with Ivy representatives in California, including Mr. Robert Johnson, Ivy's National Sales Manager, and Milan diPerro, Ivy's Chief Operating Officer.

13.     On December 10, 2009, Ivy presented Ms. Marcelo with an Employment Agreement. Ms. Marcelo reviewed and signed the Employment Agreement in California. A true and correct copy of the Employment Agreement is attached hereto as Exhibit 1. The agreement was presented to Ms. Marcelo on a take-it-or-leave-it basis. Plaintiff understood the Agreement to be Ivy's standard employment contract and that she could not decline any provision if she wanted to be

- 3 -

townsend.

VERIFIED COMPLAINT FOR DECLARATORY RELIEF, UNFAIR COMPETITION AND INJUNCTIVE RELIEF

1  employed by Ivy.

2      14.    The Employment Agreement includes a number of unlawful and unenforceable

3  provisions, one of which is a prohibited non-compete clause, contained in paragraph 7 of the

4  Employment Agreement. Paragraph 7 states "for one (1) year following the termination of

5  Employee's employment ..., Employee will not, directly or indirectly, compete with the Company

6  by providing or offering Competitive Services (as defined below) anywhere within fifteen (15)

7  miles of the location of any Company client at which, or with respect to which, Employee provided

8  services on behalf of the Company."

9      15.    The Employment Agreement also includes an unlawful and unenforceable non-

10 solicitation of clients clause in paragraph 8, which states "Employee further agrees that for one (1)

11 year following termination of Employee's employment ..., Employee shall not ...: (a) solicit,

12 contact, call upon, communicate with, or attempt to communicate with any Company client for the

13 purpose of providing Competitive Services to such client, (b) sell, provide or divert any

14 Competitive Services to any Company client, (c) perform or engage in any Competitive Services for

15 any Company client, or (d) accept or receive any Company client for the purpose of providing any

16 Competitive Services."

17     16.    The Employment Agreement includes a choice of law provision, which purports to

18 provide, contrary to law, that Virginia law is to be applied.

19     17.    During the time she was employed by Ivy, Ms. Marcelo never performed services for

20 any customer or client of Ivy other than Seton, nor did she perform any services for any customer or

21 client of Ivy in any state other than in California.

22     18.    Ms. Marcelo's day-to-day activities were conducted in Daly City, California, in her

23 office at Seton, at Seton facilities, and at local physicians' offices. Ms. Marcelo was the only local

24 and on-site Ivy personnel at Seton.

25     19.    Ms. Marcelo was, and Ivy treated her as, a California employee subject to all of the

26 laws of California. For example, Ivy withheld California income taxes from Ms. Marcelo's pay and

27 reported her employment and earnings to the California Employment Development Department.

28     20.    Ms. Marcelo gave notice of resignation from employment with Ivy on August 18,

- 4 -
townsend.   VERIFIED COMPLAINT FOR DECLARATORY RELIEF, UNFAIR COMPETITION AND INJUNCTIVE RELIEF

1  2010 due to a compensation dispute. Ms. Marcelo worked as an active employee of Ivy through
2  August 31, 2010.

3      21.    Ms. Marcelo has never at any time used any non-public information or property of
4  Ivy for any purpose other than to perform services as an employee of Ivy during her employment,
5  nor does she have any intention to use any non-public information or property of Ivy at any time in
6  the future. Ms. Marcelo does not have in her possession any documents of any kind that contain
7  any trade secret information of Ivy.

8      22.    On September 10, 2010, Ivy filed a complaint in the Circuit Court of Henrico
9  County, Virginia to enforce paragraphs 7 and 8 against Ms. Marcelo,. A true and correct copy of
10  the Complaint from the Virginia action is attached hereto as Exhibit 2.

11      23.    The Complaint in Virginia asserts additional causes of action, for example, falsely
12  accusing Plaintiff of breaching the Employment Agreement by soliciting Ivy employees,
13  misappropriating trade secrets and confidential information of Ivy, breaching a purported fiduciary
14  duty and duty of loyalty to Defendant, and tortiously interfering with Ivy's existing and prospective
15  business relations.

16      24.    Ms. Marcelo's Virginia attorney submitted an affidavit by Ms. Marcelo as part of a
17  special appearance challenging Virginia's personal jurisdiction over Ms. Marcelo. The affidavit
18  stated that Ms. Marcelo received advice from a California attorney that paragraphs 7 and 8 of the
19  Employment Agreement were prohibited under California law. A true and correct copy of Ms.
20  Marcelo's affidavit in the Virginia court, and the papers filed challenging that court's jurisdiction
21  are attached hereto as Exhibits 3 and 4, respectively.

22      25.    On information and belief, on or about September 27, 2010, the Virginia court
23  rejected Plaintiff's challenges to jurisdiction and, ignoring clear California law prohibiting such
24  contractual prohibitions on future employment competition, issued a preliminary injunction in
25  Defendants' favor enforcing paragraphs 7 and 8 against Ms. Marcelo. On information and belief,
26  the Virginia injunction has no geographical limitations, and on its face purports to restrain Ms.
27  Marcelo's actions in California. Defendants to date have not served the injunction on Ms. Marcelo.
28      26.    On information and belief, Ivy plans on enforcing the Virginia injunction to restrain

- 5 -

1   Ms. Marcelo's employment opportunities in California.

2       27.    Ivy has suffered no damage of any kind because of any act or omission of Ms.

3   Marcelo's.

4       28.    Due to Ivy's attempted enforcement of the unlawful non-compete provisions of the

5   Employment Agreement, Ms. Marcelo is threatened from being able to seek employment in her

6   field, and has been unable to compete for service contracts, including at e ad at O'Connor Hospital

7   in San Jose California.

8       29.    In addition, Ms. Marcelo presently intends to pursue a contract with Seton to provide

9   sales and marketing services when Seton's current contract with Ivy ends in or about the month of

10  October 2010. It is important that Ms. Marcelo be able to compete for the Seton contract, as it

11  would allow the stability she needs to build a business and eventually hire employees in California.

12      30.    On information and belief, personnel at Seton value Ms. Marcelo's work ethic,

13  compatibility with Seton's Vincentien values, and impact on the Seton community.

14      31.    On information and belief, Ivy is presently trying to convince Seton to renew its

15  contract with Ivy when the contract ends, and is, among other improper acts, unlawfully relying on

16  the unlawful terms in the Employment Agreement to prevent Plaintiff from competing for the work

17  at Seton.

18      32.    On information and belief, if Ms. Marcelo were unable to compete for the Seton

19  contract, she would be effectively prevented from obtaining employment at Seton for at least the

20  next year, if not longer, as is the case with O'Connor Hospital.

21      33.    If Defendant is allowed to enforce the prohibited terms in California, Plaintiff will be

22  prevented from seeking lawful employment in California as guaranteed by Business and Professions

23  Code § 16600.

24      34.    If Defendant is allowed to enforce the 15-mile zone of exclusion defined in

25  paragraph 7(a) of the Employment Agreement, Plaintiff would be excluded from working for a

26  significant number of the hospitals, independent imaging centers and other health services facilities

27  throughout the San Francisco Bay Area.

28      35.    If Defendant is allowed to enforce the non-solicitation of clients provision of

- 6 -

townsend.

paragraph 8 of the Employment Agreement, Plaintiff would be unable to earn a livelihood in her chosen profession anywhere in the United States, as she would have no knowledge of what companies Ivy solicited within one year of August 31, 2010.

### FIRST CAUSE OF ACTION
**(Declaratory Judgment that Paragraphs 7 and 8 of the Employment Agreement are Void as an Unlawful Restraint of Trade and that Plaintiff has Not Breached the Employment Agreement, Breached any Fiduciary Duty or Duty of Loyalty of Ivy's, Misappropriated Ivy's Trade Secrets and Confidential Information, or Tortiously Interfered With Ivy's Existing and Prospective Business Relations)**

36.    Plaintiff incorporates and realleges paragraphs 1-35 above as if each allegation in those paragraphs were set forth fully herein.

37.    An actual controversy has arisen and now exists between Plaintiff, on the one hand, and Defendant, on the other, concerning whether paragraphs 7 and 8 of the Employment Agreement are valid and enforceable restrictions in California. Plaintiff alleges that paragraphs 7 and 8 are void and unenforceable as an illegal restraint on trade under Business and Professions Code § 16600 and cases interpreting the code. Through its complaint in Virginia, Defendant has alleged that paragraphs 7 and 8 in the Employment Agreement are valid and enforceable in California for a California resident, for work to be performed in California and taxes to be paid in California.

38.    Plaintiff seeks a declaratory judgment that California law is applicable to the validity and enforceability of the Employment Agreement in California, and that Business and Professions Code § 16600 prohibits paragraphs 7 and 8 of the Employment Agreement.

39.    This judicial declaration is necessary and appropriate at this time under the circumstances in order that Plaintiff and Defendant may ascertain Plaintiff's rights and duties in California under paragraphs 7 and 8 of the Employment Agreement.

40.    An actual controversy has arisen and now exists between Plaintiff, on the one hand, and Defendant, on the other, concerning whether Plaintiff has breached the Employment Agreement, breached any fiduciary duty or duty of loyalty of Ivy's, misappropriated Ivy's trade secrets and confidential information, or tortiously interfered with Ivy's existing and prospective business relations.

41.    Plaintiff seeks a declaratory judgment that she has not breached the Employment

townsend.

1    Agreement, that she will not breach the Employment Agreement by seeking employment within 15

2    miles of Seton Medical Center or by soliciting work from Seton or any other "client" of Ivy's in the

3    state of California, and that Plaintiff has not breached any fiduciary duty or duty of loyalty of Ivy's,

4    misappropriated Ivy's trade secrets and confidential information, or tortiously interfered with Ivy's

5    existing and prospective business relations.

6                                **SECOND CAUSE OF ACTION**

7    **(For Violation of Business and Professions Code §§ 17200 *et seq.* and for Injunctive Relief and
     Declaratory Judgment of Unfair Competition by Inclusion of Paragraphs 7 and 8 in the**

8    **Employment Agreement, Attempting to Enforce these Provisions in California, and other Acts
     Undertaken by Defendant)**

9        42.    Plaintiff incorporates and realleges paragraphs 1-41 above as if each allegation in

10   those paragraphs were set forth fully herein.

11       43.    An actual controversy has arisen and now exists between Plaintiff, on the one hand,

12   and Defendant, on the other, concerning whether Defendant's inclusion of paragraphs 7 and 8 in the

13   Employment Agreement constitutes, and enforcement of these paragraphs in California would

14   constitute engaging in "unfair competition" under Business And Professions Code §§ 17200 *et seq.*

15   Ms. Marcelo alleges that the inclusion of paragraphs 7 and 8, and other acts undertaken by

16   Defendant constitute, and that the enforcement in the California of said paragraphs would constitute

17   ,engaging in "unfair competition" in violation of Business and Professions Code §§ 17200 *et seq.*

18   Through Ivy's continuing pursuit of the enforcement of paragraphs 7 and 8 in California, Ivy has

19   asserted that (a) the inclusion of paragraphs 7 and 8 in the Employment Agreement for a California

20   resident for work to be performed in California and taxes to be paid in California and (b) enforcing

21   paragraphs 7 and 8 in Virginia against acts solely within California do not constitute engaging in

22   "unfair competition" under California law.

23       44.    The unfair and unlawful acts of Defendant alleged herein were undertaken as part of

24   its business practice within the state of California and have directly caused Plaintiff injury.

25       45.    Plaintiff seeks a declaratory judgment that the inclusion of paragraphs 7 and 8 in the

26   Employment Agreement constitute "unfair competition" under Business and Professions Code §§

27   17200 *et seq.*, and the enforcement of the prohibited terms against acts within California is also

28   "unfair competition" under Business and Professions Code §§ 17200 *et seq.*

                                           - 8 -

1      46.    Under Business and Professions Code §§ 17200 *et seq.*, Plaintiff also seeks a

2  temporary restraining order, preliminary injunction, and permanent injunction restraining and

3  enjoining Ivy from enforcing any out-of-state judgment enforcing paragraphs 7 and 8 against acts

4  that have occurred or will occur in California.

5      47.    The judicial declarations are necessary and appropriate at this time to determine

6  Plaintiff's ability to seek employment without restrictions under the prohibited terms and to

7  determine Defendant's liability in continuing to pursue enforcement of the prohibited terms in

8  California.

9      48.    Defendant's wrongful conduct, unless and until enjoined and restrained by order of

10  this court, will cause great and irreparable injury to Plaintiff, for which Plaintiff has no adequate

11  remedy at law. Enforcement of paragraphs 7 and 8 of the Employment Agreement would prevent

12  Plaintiff from attempting to obtain employment at Seton Medical Center at a crucial decision time at

13  the end of October 2010. Further, Defendant would be allowed to unlawfully restrain Plaintiff from

14  seeking employment through the enforcement of paragraphs 7 and 8 of the Employment

15  Agreement, which are void and unenforceable under Business and Professions Code § 16600.

16  Finally, enforcement of the 15-mile zone of exclusion contained in paragraph 7(a) of the

17  Employment Agreement would seriously impede Plaintiff's ability to earn a living by working

18  within the exclusion zone around Seton Medical Center.

19      **WHEREFORE, PLAINTIFF PRAYS** for judgment against Defendant as follows:

20  That the Court issue judicial determinations, as a matter of law, that:

21      (a)    Paragraphs 7 and 8 of the Employment Agreement are illegal restraints of

22  trade that are void and unenforceable in California.

23      (b)    The inclusion of paragraphs 7 and 8 in the Employment Agreement and

24  attempted enforcement of the prohibited terms and conditions constitute unfair business practices

25  under Business and Professions Code §§ 17200 *et seq.* and are prohibited by law.

26      (c)    That plaintiff has misappropriated any trade secrets belonging to

27  Defendants and has not violated any other enforceable, legal rights of Defendants.

28      49.    In the part of the action brought under §§ 17200 *et seq.*, that the Court issue a

- 9 -

1  temporary restraining order, preliminary injunction, and permanent injunction restraining and

2  enjoining Ivy from enforcing in the state of California any out of state judgment enforcing

3  paragraphs 7 and 8 of the Employment Agreement against acts that have occurred or will occur in

4  California.

5         50.     For exemplary damages in an amount to be proven at trial;

6         51.     For an order awarding Plaintiff its costs and reasonable attorneys fees for this action

7  and any applicable prejudgment and post-judgment interest;

8         52.     For such other and further relief as may be just and proper.

9  **JURY DEMAND**

10         53.     Plaintiff demands a jury trial for all issues so triable.

11

12  DATED: October 12, 2010        Respectfully submitted,

13              TOWNSEND AND TOWNSEND AND CREW LLP

14

15              By:

16                 MARK T. JANSEN
               BYRON R. CHIN

17                 Attorneys for Plaintiff
               Myra Marcelo

18

19  62919218 v2

20

21

22

23

24

25

26

27

28

- 10 -

1

## VERIFICATION

2

3      I, Myra Marcelo, do hereby declare and state that:

4      1.      I am the Plaintiff in the above-entitled action.

5      2.      I have read the VERIFIED COMPLAINT FOR DECLARATORY RELIEF,

6   UNFAIR COMPETITION, AND INJUNCTIVE RELIEF and know the contents thereof.

7      3.      The same is true of my own knowledge, except as to those matters where are

8   therein stated on information and belief, and as to those matters, I am informed and believe they

9   are true, and on that ground, I allege that the matters stated therein are true.

10      I declare under penalty of perjury under the laws of the State of California that the

11   foregoing is true and correct.

12      EXECUTED on this ___*II*___ day of October, 2010, at San Francisco, California.

13

14                                                          Myra Marcelo

15   62933494 v1

16

17

18

19

20

21

22

23

24

25

26

27

28

# EMPLOYMENT AGREEMENT

THIS AGREEMENT is made as of the December 14, 2009, by and between IVY VENTURES, LLC, a Virginia limited liability company (the "Company"), and MYRA LYNN T. MARCELO ("Employee").

## RECITAL

A.    The Company is in the business of operating, managing, marketing and providing consulting services to hospitals, diagnostic imaging facilities and other outpatient services.

B.    The Company wishes to employ Employee as a community educator, and Employee has agreed to accept such employment, on the terms and conditions set forth herein.

## AGREEMENT:

In consideration of the following mutual and reciprocal promises and conditions, the parties agree as follows:

1.    **Employment.**    The Company hereby employs Employee as a marketing representative and Employee agrees to be employed by the Company in such capacity. Employee acknowledges, as fully described in Section 5(b) of this Agreement, that continued employment with the Company requires Employee to take a test for the presence of illegal drugs in Employee's system within seven (7) days from the date Employee signs this Agreement. Employee agrees to devote all of Employee's professional time using Employee best efforts, attention and energies to the performance of the duties and responsibilities assigned to Employee from time to time by the Company.    Employee further agrees to comply with all of the Company's policies, standards, and regulations.    Employee will not allow any other interest or pursuits to interfere with the performance of Employee's job duties and responsibilities for the Company.

2.    **Term.**    The term of employment under this Agreement shall commence as of the date hereof, and it shall continue until terminated as provided in Sections 5(a) and 5(b) of this Agreement.

3.    **Duties.**    Employee shall perform those duties assigned to Employee by the Company.

4.    **Compensation and Benefits.**

(a)    Compensation.    In exchange for the faithful rendering of any and all services by Employee in any capacity hereunder, the Company shall pay Employee during the term of employment an annual base salary of Sixty Two Thousand Five Hundred dollars



EXHIBIT
1

($62,500.00) per year, payable in equal semi-monthly payments on the Company's regular semi-monthly pay dates, less applicable taxes and withholding.

Employee shall be further entitled to certain client longevity bonuses relating to (i) continued service by Employee at **Seton Medical Center ("Seton")** and (ii) the Company maintaining the existing contract with **Seton** (or renewals on substantially similar terms), provided Employee is still employed by Company on each of the dates such bonuses are payable and that Employee is not in breach of this Agreement. These longevity bonuses shall be earned as set forth in the table below:

| Date of Continued Service by Employee and Maintenance of Client Contract | Longevity Bonus |
|---|---|
| March 15, 2011 | $1,875 |
| June 15, 2011 | $1,875 |
| September 15, 2011 | $1,875 |
| December 15, 2011 | $1,875 |
| March 15, 2012 | $1,250 |
| June 15, 2012 | $1,250 |
| September 15, 2012 | $1,250 |
| December 15, 2012 | $1,250 |

Any earned client longevity bonuses will be paid to Employee in the paycheck immediately following the date such bonus is earned.

Additionally, Employee shall have the opportunity to earn quarterly performance-based compensation in accordance with Company designed incentive plans.

(b)     Benefits.  The Company shall provide Employee with (i) a $500.00 per month automobile allowance, (ii) health insurance benefits and (iii) other benefits as are provided to similar employees of the Company.  Employee may be required to pay a portion of health insurance or other benefits.

(c)     Reimbursement of Business Expenses.  The Company agrees to reimburse Employee for all reasonable, ordinary and necessary business expenses incurred by Employee for the benefit of the Company and at the direction and with the prior authorization of the Company.  The Company shall reimburse Employee upon submission to the Company of written, itemized accounts of such expenditures, together with receipts therefor.

(d)     Vacation, Sick Leave, Holidays and Tuition.  Employee shall earn (i) 4.61 hours of vacation time per semi-monthly pay period (120 hours total per year) and (ii) 1.67 hours of sick time per semi-monthly pay period (40 hours total per year).  Employee shall be entitled to holidays, and other benefits as provided to similar employees of the Company.

2

## 5.    Termination of Employment.

(a)    Termination by Either Party. Either party may terminate this Agreement at any time, for any reason, with or without cause, upon thirty (30) days written notice to the other party.

(b)    Termination by the Company Based on Positive Drug or Alcohol Test. In addition to the termination provisions as set forth in Section 5(a) of this Agreement, the Company may terminate this Agreement as follows:

(i)    Employee's continued employment with the Company requires Employee to take a test for the presence of illegal drugs in Employee's system within seven (7) days from the date Employee signs this Agreement. A positive test for certain illegal drugs and substances will result in the immediate termination of Employee's employment with the Company, and the Company will not be required to provide any written notice prior to such termination, nor will the Company be required to pay Employee any salary or benefits following the termination. Failure to take the test within the seven (7) days, refusing to take the test or sign the consent and authorization form for the test, tampering with the sample given, or giving an adulterated sample shall constitute a positive test.

(ii)    Employee has the continuing duty throughout the term of Employee's employment with the Company to comply with the Company's drug and alcohol use policy and drug testing policy (collectively, the "Policies") contained in the Employee Handbook. As a part of the Policies, Employee may be required to take additional tests for the presence of illegal drugs or alcohol in Employee's system. A positive test for certain illegal drugs or alcohol may result in discipline up to and including termination of Employee's employment with the Company. If the Company terminates Employee's employment with the Company for such a positive test, the Company will not be required to provide any written notice prior to such termination, nor will the Company be required to pay Employee any salary or benefits following the termination. Failure to take the test at the time and place designated by the Company, refusing to take the test or sign the consent and authorization form for the test, tampering with the sample given, or giving an adulterated sample shall constitute a positive test.

(c)    Payment Upon Termination. Upon the termination of Employee's employment, Employee shall be entitled to receive (i) salary earned by Employee prior to termination, (ii) benefits through the date of termination, and (iii) reimbursement in accordance with Section 4(c) of properly documented and authorized expenses incurred prior to the date of termination.

## 6.    Non-Disclosure Of Confidential Information.

(a)    Employee agrees to hold and safeguard any information about the Company or any clients of the Company gained by Employee during the term of Employee's employment. Employee shall not, without the prior written consent of the Company, misappropriate, disclose or make available to anyone for use outside the Company's organization at any time, either during Employee's employment or subsequent to any termination of Employee's employment, whether such termination is effected by Employee or the Company,

3

with or without cause, any such information about the Company or its clients, whether or not developed by Employee, except as required in the performance of Employee's duties for the Company.

(b)     Employee understands and agrees that any non-public information about the Company or its clients which Employee learned or obtained during the term of Employee's employment by the Company is the property of the Company and is essential to the protection of the Company's goodwill and to the maintenance of its competitive position and accordingly, must be kept secret.     Such information shall include, but not be limited to, information concerning the Company's, or any client's, services, service volume, marketing methods, marketing proposals, cost and pricing structures, volume information, service information, clients and prospective clients, identity of clients and prospective clients, identity of key contracting personnel in the employ of clients and prospective clients, amount or kind of service obtained from the Company, the Company's computer programs, system documentation, special hardware, products hardware, related software development, its manuals, formulae, processes, methods, machines, compositions, ideas, improvements, inventions, or other confidential or proprietary information belonging to the Company or relating to the Company's affairs or the affairs of its clients.

(c)     The parties acknowledge and agree that records, files, reports, manuals, handbooks, computer diskettes, computer software, customer files and information, documents, equipment and the like, relating to the Company's business, or its client's business, or which are developed for or by the Company, or which Employee shall develop, create, use, prepare or come into possession of during Employee's employment with the Company, shall remain the sole property of the Company and Employee covenants to promptly deliver to the Company any and all such property, and any copies thereof no later than the termination of Employee's employment with the Company.

(d)     Nothing in this Section 6 shall prohibit Employee from making any disclosure that is ordered by a court in any legal proceeding.

7.     **Covenant Not to Compete.**

Employee acknowledges that during the course of Employee's employment, Employee has obtained or will acquire confidential information about the Company's business and clients and that Employee may be responsible for contacting and developing relationships with the Company's customers. Accordingly;

(a)     Employee agrees that during the term of Employee's employment and for one (1) year following the termination of Employee's employment, whether such termination is effected by Employee or the Company, with or without cause, Employee will not, directly or indirectly, compete with the Company by providing or offering Competitive Services (as defined below) anywhere within fifteen (15) miles of the location of any Company client at which, or with respect to which, Employee provided services on behalf of the Company.

(b)     Employee agrees that the activities prohibited hereby shall include providing Competitive Services, either as an individual, as a partner, as a joint venturer with any

4

other person or entity, or as an employee, agent, director, officer, consultant, independent contractor or representative of any other person or entity, or otherwise being associated with any person or business entity that offers or provides Competitive Services.

(c)     For the purposes of this Agreement, "Competitive Services" shall mean services that are (i) substantially similar to the services provided by Employee to, or on behalf of, the Company while employed by the Company, and (ii) offered or provided to any person or entity that is engaged in the business of owning, operating, managing, marketing or providing consulting services to hospitals, diagnostic imaging facilities or other outpatient services.

(d)     Employee recognizes that, this covenant not to compete is of mutual benefit to the Company and Employee and is supported by full and adequate consideration including, but not limited to, the employment of Employee by the Company and the compensation described herein, and that the Company, as a result of successful operation and an investment of time and capital, has developed good will and earning power, that the restrictions and covenants set forth in this Agreement are reasonable and necessary for the protection of the Company's legitimate business interests and that the Company will suffer irreparable harm in the event of a breach by Employee of any of the foregoing provisions.

## 8.     Non-Solicitation Of Clients.

Employee agrees that during Employee's employment with the Company, Employee shall not, directly or indirectly, solicit the trade of, or trade with, any customer or prospective customer of the Company for any business purpose other than for the benefit of the Company. Employee further agrees that for one (1) year following termination of Employee's employment, whether such termination is effected by Employee or the Company, with or without cause, Employee shall not, directly or indirectly, as an owner, officer, director, employee, agent, representative, consultant or independent contractor: (a) solicit, contact, call upon, communicate with, or attempt to communicate with any Company client for the purpose of providing Competitive Services to such client, (b) sell, provide or divert any Competitive Services to any Company client, (c) perform or engage in any Competitive Services for any Company client, or (d) accept or receive any Company client for the purpose of providing any Competitive Services. "Company client" shall refer to: (1) any individual or entity that was a client of the Company within one year of Employee's termination or (2) any individual or entity that was solicited for business by the Company within one year of Employee's termination.

## 9.     Compliance with Client Policies.

Employee agrees to comply with all applicable policies of the Company's clients for which Employee provides services, including all policies relating to the confidentiality of patient medical information under the federal HIPAA Act and all other regulations.

## 10.     Non-Solicitation Of Employees.

Employee agrees that during Employee's employment with the Company and for one (1) year following termination of Employee's employment, whether such termination is effected by Employee or the Company, with or without cause, Employee shall not, directly or

5

indirectly, solicit or induce, or attempt to solicit or induce, any present or future employee of the Company to leave the Company for any reason whatsoever or hire any individual employed by the Company.

11. **Injunctive Relief.**

(a)      Employee acknowledges that the remedies at law for any breach by Employee of any restrictive covenant contained in this agreement will be inadequate due to the potential for immediate and irreparable injury to the Company and that the Company shall be entitled to injunctive relief against Employee in addition to any other remedies available to the Company, including but not limited to, the recovery of damages from Employee.

(b)      Employee agrees that the obligations set forth in Sections 7, 8 and 9 contained herein shall be extended by the length of time which Employee shall have been in breach of any of the provisions. Employee recognizes that the time periods included in the restrictive covenants contained herein shall begin on the date a court of competent jurisdiction enters a final order enjoining Employee from violating such provisions unless good cause can be shown as to why the periods described should not begin at that time.

12. **Reasonableness of Restraints.** It is the intention of the parties that the provisions of the restrictive covenants herein shall be enforceable to the fullest extent permissible under the applicable law. The parties agree that it is their intention that should any provision or subdivision of this Agreement, including, but not limited to, any aspect of the restraints or remedies imposed under Sections 6, 7, 8, 9 and 10 hereof, be found by a court of competent jurisdiction to be unreasonable or otherwise unenforceable, any such provision shall nevertheless be enforceable to the extent such court shall deem reasonable, and, in such event, it is the parties' intention, desire and request that the court reform such provision to the degree minimally necessary to render such provision, as reformed, reasonable and enforceable under applicable law. In the event of such judicial reformation, the parties agree to be bound by this Agreement as reformed in the same manner and to the same extent as if they had agreed to such reformed agreement in the first instance.

13. **Restrictive Covenants of the Essence.** The restrictive covenants of Employee set forth herein are of the essence of this Agreement; they shall be construed as independent of any other provision in this Agreement; and the existence of any claim or cause of action of Employee against the Company, whether predicated on this Agreement or not, shall not constitute a defense to the enforcement by the Company of the restrictive covenants contained herein. The Company shall at all times maintain the right to seek enforcement of these provisions whether or not the Company has previously refrained from seeking enforcement of any such provision as to Employee or any other person who has signed an agreement with similar provisions.

14. **Governing Law.** The parties acknowledge and agree that this Agreement is made in the Commonwealth of Virginia, and that the interpretation and performance hereof shall be governed in all respects by the laws of the Commonwealth of Virginia, excluding its choice of law rules.

15. **Severability.** Employee agrees that if any provision of this Agreement, or any portion thereof, shall be adjudged by any court of competent jurisdiction to be invalid or

6

unenforceable for any reason, such determination shall be confined to the operation of the provision at issue and shall not affect or invalidate any other provision of this Agreement and such court shall be empowered to substitute, to the extent enforceable, provisions similar thereto or other provisions so as to provide the Company to the fullest extent permitted by applicable law the benefits intended by such provisions.

16.     **Modifications; Waivers.**     This Agreement may be modified only by an instrument in writing signed by both parties. No waiver of the enforcement of any provisions of the Agreement shall be deemed a continuing waiver.

17.     **Assignability.**  The Agreement shall be assignable by the Company but not by Employee.     The obligations of Employee under this Agreement shall continue after the termination of Employee's employment with the Company; however such termination is effected, whether by Employee or the Company, with or without cause or notice, and shall be binding on Employee's heirs, executors, legal representatives, assigns and shall inure to the benefit of any successors or assigns of the Company. Employee specifically acknowledges that in the event of a sale of all or substantially all of the assets or stock of the Company, or any other event, merger, or transaction resulting in a change of ownership or control of the Company's business, the rights and obligations of the parties hereunder shall inure to the benefit of any such transferee, purchaser or future owner of the Company's business. Employee specifically consents to the assignment by the Company of the Company's rights pursuant to Section 7, 8 and 9 of this Agreement protecting the Company from unfair competition.

18.     **Entire Agreement.** This Agreement sets forth the entire agreement of the parties with respect to the subject matter hereof.

19.     **Forum Selection.** The parties agree that the exclusive venue for the resolution of any dispute arising from the provisions of this Agreement shall lie with any court of competent jurisdiction in Henrico County, Virginia.

20.     **Attorney's Fees.** The parties agree that in the event of any breach or attempted breach by either party of any of the provisions of this Agreement, the other party shall be entitled to reimbursement of any costs or expenses, including but not limited to, reasonable attorney's fees, incurred by enforcing this Agreement.

21.     **Notices.** Any notice required or permitted to be given under this Agreement shall be considered as properly given if in writing and (a) delivered by hand, (b) sent by overnight courier, (c) mailed by registered or certified mail, return receipt requested and postage prepaid, or (d) sent by telex, facsimile, telecopy or email, in each case addressed as follows:

If to Company:

Ivy Ventures, LLC
7231 Forest Avenue, Suite 306
Richmond, VA 23226
804-862-1881 (fax)
rjohnson@ivyventures.com

7

If to Employee:

Myra Lynn T. Marcelo
383 King Street, #1016
San Francisco, CA 94158
650-430-1283 (cell)
myramarcelo1@yahoo.com

Delivery of any notice hereunder shall be effective only upon actual receipt thereof by the party
to whom such communication is directed. Either party to this Agreement may change the
address to which communications hereunder are to be directed by giving written notice to the
other party in the manner provided in this section.

   IN WITNESS WHEREOF, the parties have affixed their signatures and seals as of the
date first above written.

### COMPANY:

IVY VENTURES, LLC

By:

Name: K. Roger Johnson, Jr.
Title: Manager

### EMPLOYEE:

_____(SEAL)
Name: Myra Lynn T. Marcelo

8

VIRGINIA:

## IN THE CIRCUIT COURT OF HENRICO COUNTY

IVY VENTURES, LLC,                    )
Plaintiff,                            )
                                      )
v.                                    ) Case No. 087 CL 10002539-00
                                      )
MYRA LYNN T. MARCELO,                 )
Defendant.                            )

RECEIVED
SEP 1 0 2010
CLERK'S OFFICE
HENRICO CIRCUIT COURT

## FIRST AMENDED VERIFIED COMPLAINT

Plaintiff, Ivy Ventures, LLC ("Ivy"), by counsel, submits its First Amended Verified Complaint against Defendant Myra Lynn T. Marcelo ("the Defendant"). Ivy seeks temporary and permanent injunctive relief to prevent the Defendant from further violations of her Employment Agreement with Ivy, which include the following provisions: (a) Non-Disclosure of Confidential Information, (b) Covenant Not to Compete, (c) Non-Solicitation of Clients, and (d) Non-Solicitation of Employees.

### NATURE OF THE ACTION

1.      This action arises out of the numerous breaches of fiduciary duty owed by Defendant to her former employer, Ivy, under Virginia common law, Virginia statutory law, and pursuant to the terms of her contractual agreements with Ivy.

### THE PARTIES

2.      Ivy is a Virginia limited liability company with its principal place of business in Richmond, Virginia. Ivy provides operating, managing, marketing and consulting services to hospitals, diagnostic imaging facilities and other outpatient services.

3.      Upon information and belief, Defendant is a resident of San Francisco, California.

1

## JURISDICTION AND VENUE

4.     The Court has personal jurisdiction over Defendant because she has consented to such jurisdiction. *See* Employment Agreement (Ex. 1) ¶ 14 ("The parties acknowledge and agree that this Agreement is made in the Commonwealth of Virginia, and that the interpretation and performance hereof shall be governed in all respects by the laws of the Commonwealth of Virginia[.]"). Moreover, Defendant entered into the Employment Agreement in the Commonwealth of Virginia, and has conducted business in Virginia.

5.     Venue is proper in this Court because Defendant conducts business in this judicial district, the events giving rise to the Complaint occurred in this district, and Defendant agreed in her Employment Agreement that "the exclusive venue for the resolution of any dispute arising from the provisions of this Agreement shall lie with any court of competent jurisdiction in Henrico County, Virginia." *See id.* ¶ 19 ("Forum Selection").

## STATEMENT OF FACTS

### *Defendant's Employment Agreement with Ivy*

6.     On or about December 14, 2009, Ivy entered into an Employment Agreement with Defendant to employ her as a community educator, which included acting as marketing representative for imaging at one of Ivy's clients, Seton Medical Center in Daly City, California ("Seton").

7.     As conditions of the Employment Agreement, Defendant agreed to the following provisions: Non-Disclosure of Confidential Information, *see* Employment Agreement ¶ 6, a Covenant Not to Compete, *id.* ¶ 7, Non-Solicitation of Clients, *id.* ¶ 8, and Non-Solicitation of Employees. *Id.* ¶ 10.

2

8.    Defendant agreed to the Non-Disclosure of Confidential Information provision,

*id.* ¶ 6, which provides in relevant part that:

(a)    Employee agrees to hold and safeguard any information about the Company or any clients of the Company gained by Employee during the term of Employee's employment. Employee shall not, without the prior written consent of the Company, misappropriate, disclose or make available to anyone for use outside the Company's organization at any time, either during Employee's employment or subsequent to any termination of Employee's employment, whether such termination is effected by Employee or the Company, with or without cause, any such information about the Company or its clients, whether or not developed by Employee, except as required in the performance of Employee's duties for the Company.

(b)    Employee understands and agrees that any non-public information about the Company or its clients which Employee learned or obtained during the term of Employee's employment by the Company is the property of the Company and is essential to the protection of the Company's goodwill and to the maintenance of its competitive position and accordingly, must be kept secret. Such information shall include, but not be limited to, information concerning the Company's, or any client's, services, service volume, marketing methods, marketing proposals, cost and pricing structures, volume information, service information, clients and prospective clients, identity of clients and prospective clients, identity of key contracting personnel in the employ of clients and prospective clients, amount or kind of service obtained from the Company, the Company's computer programs, system documentation, special hardware, products hardware, related software development, its manuals, formulae, processes, methods, machines, compositions, ideas, improvements, inventions, or other confidential or proprietary information belonging to the Company or relating to the Company's affairs or the affairs of its clients.

(c) The parties acknowledge and agree that records, files, reports, manuals, handbooks, computer diskettes, computer software, customer files and information, documents, equipment and the like, relating to the Company's business, or its client's business, or which are developed for or by the Company, or which Employee shall develop, create, use, prepare or come into possession of during Employee's employment with the Company, shall remain the sole property of the Company and Employee covenants to promptly deliver to the Company any and all such property, and any copies thereof no later than the termination of Employee's employment with the Company.

3

9.     Defendant agreed to the Covenant Not to Compete provision, *id.* ¶ 7, which

provides in relevant part:

> Employee acknowledges that during the course of Employee's employment,
> Employee has obtained or will acquire confidential information about the
> Company's business and clients and that Employee may be responsible for
> contacting and developing relationships with the Company's customers.
> Accordingly,
>
> (a) Employee agrees that during the term of Employee's employment and for
> one (1) year following the termination of Employee's employment, whether
> such termination is effected by Employee or the Company, with or without
> cause, Employee will not, directly or indirectly, compete with the Company
> by providing or offering Competitive Services (as defined below) anywhere
> within fifteen (15) miles of the location of any Company client at which, or
> with respect to which, Employee provided services on behalf of the
> Company.
>
> (b) Employee agrees that the activities prohibited hereby shall include
> providing Competitive Services, either as an individual, as a partner, as a joint
> venturer with any other person or entity, or as an employee, agent, director,
> officer, consultant, independent contractor or representative of any other
> person or entity, or otherwise being associated with any person or business
> entity that offers or provides Competitive Services.
>
> (c) For the purposes of this Agreement, "Competitive Services" shall mean
> services that are (i) substantially similar to the services provided by Employee
> to, or on behalf of, the Company while employed by the Company, and (ii)
> offered or provided to any person or entity that is engaged in the business of
> owning, operating, managing, marketing or providing consulting services to
> hospitals, diagnostic imaging facilities or other outpatient services.
>
> (d) Employee recognizes that this covenant not to compete is of mutual
> benefit to the Company and Employee and is supported by full and adequate
> consideration including, but not limited to, the employment of Employee by
> the Company and the compensation described herein, and that the Company,
> as a result of successful operation and an investment of time and capital, has
> developed good will and earning power, that the restrictions and covenants
> set forth in this Agreement are reasonable and necessary for the protection of
> the Company's legitimate business interests and that the Company will suffer
> irreparable harm in the event of a breach by Employee of any of the foregoing
> provisions.

10.    Defendant agreed to the Non-Solicitation of Clients provision, *id.* ¶ 8, which

provides that:

4

Employee agrees that during Employee's employment with the Company, Employee shall not, directly or indirectly, solicit the trade of, or trade with, any customer or prospective customer of the Company for any business purpose other than for the benefit of the Company. Employee further agrees that for one (1) year following termination of Employee's employment, whether such termination is effected by Employee or the Company, with or without cause, Employee shall not, directly or indirectly, as an owner, officer, director, employee, agent, representative, consultant or independent contractor: (a) solicit, contact, call upon, communicate with, or attempt to communicate with any Company client for the purpose of providing Competitive Services to such client, (b) sell, provide or divert any Competitive Services to any Company client, (e) perform or engage in any Competitive Services for any Company client, or (d) accept or receive any Company client for the purpose of providing any Competitive Services. "Company client" shall refer to: (l) any individual or entity that was a client of the Company within one year of Employee's termination or (2) any individual or entity that was solicited for business by the Company within one year of Employee's termination.

11. Defendant agreed to the Non-Solicitation of Employees provision, *id.* ¶ 10, which

provides:

Employee agrees that during Employee's employment with the Company and for one (1) year following termination of Employee's employment, whether such termination is effected by Employee or the Company, with or without cause, Employee shall not, directly or indirectly, solicit or induce, or attempt to solicit or induce, any present or future employee of the Company to leave the Company for any reason whatsoever or hire any individual employed by the Company.

12. As a community educator and marketing representative, Defendant enjoyed a special position of trust and confidence with Ivy, which included the disclosure of non-public information about Ivy and its clients that was the property of Ivy, was essential to the protection of Ivy's goodwill and the maintenance of its competitive position, was confidential and proprietary, and, therefore, was required to be kept secret by Defendant both during and subsequent to any termination of her employment with Ivy. *See id.* ¶ 6(a)-(c).

5

13.     By agreeing to the Non-Disclosure of Confidential Information in the Employment Agreement, Defendant agreed that the information provided to her has a significant competitive and proprietary information and was extremely valuable to Ivy.

14.     As a result of the managerial positions with Ivy, Defendant was provided with highly sensitive confidential and proprietary information about existing Ivy customers and employees, and she was provided access to existing customers and employees in order to develop relationships and establish trust and reliance on their knowledge and judgments.     In fact, Ivy specifically trained the Defendant regarding all of this confidential and proprietary information, and introduced her to Ivy's client, based on an expectation that she would not breach her Employment Contract by misappropriating confidential trade secrets or client information that she was given access to do her job.

15.     During her time as an employee of Ivy, Defendant had daily contact with Ivy's customers and employees, developing experience and skills as a marketing representative of imaging.

16.     Defendant gained intimate knowledge of Ivy's customer and employee base, customer and employee lists and identities, employees' personal information, including email addresses and phone numbers, customer account information, customer agents and account managers, marketing methods, employee handbooks and manuals, written financial information, business plans, and other confidential and proprietary information not known to the general public (collectively referred to as "trade secrets"). All of the trade secrets Defendant knew or to which she had access were at all times deemed to be highly confidential by Ivy and by Defendant in her Employment Agreement.

6

17. Defendant also agreed to maintain the confidentiality of any and all information regarding Ivy's clients, work done for Ivy's clients, and any information received in connection with such work for Ivy's clients, by agreeing to the confidentiality terms set out in Ivy's Employee Handbook. *See* Employee Handbook with Defendant's Signature at 4 (Ex. 2).

18. Ivy made reasonable efforts to preserve the confidentiality of its trade secrets, including confidential customer and employee information, as exemplified by the Non-Disclosure of Confidential Information, Covenant Not to Compete, Non-Solicitation of Clients, and Non-Solicitation of Employees provisions, as well as the Confidentiality provision in the Employee Handbook, all of which Defendant specifically agreed to be obligated to maintain the confidentiality of Ivy's confidential trade information.

19. Defendant also agreed that all of the restrictive covenants in her Employment Agreement with Ivy, including the Non-Disclosure of Confidential Information, Covenant Not to Compete, Non-Solicitation of Clients, and Non-Solicitation of Employees provisions, were reasonable and enforceable " to the fullest extent permissible under the applicable law." *See* Employment Agreement ¶ 12.

20. As evidence of the valuable nature of the confidential information provided to Defendant, as well as the value Ivy placed on its relationships with its employees and customers, Defendant agreed that money damages would not be a sufficient remedy for any breach of the Non-Disclosure of Confidential Information, Covenant Not to Compete, Non-Solicitation of Clients, and Non-Solicitation of Employees provisions of the Employment Agreement. *See id.* ¶11.

7

21.     Therefore, upon any breach of the Non-Disclosure of Confidential Information, Covenant Not to Compete, Non-Solicitation of Clients, and Non-Solicitation of Employees provisions of the Employment Agreement by Defendant, Ivy could request injunctive relief in order to enforce or prevent any violations without proving actual damages. *Id.*

22.     Furthermore, upon any breach of the Employment Agreement by Defendant, Ivy could hold Defendant responsible for all costs and attorneys' fees spent to redress such a violation. *Id.* ¶ 20.

## Violations of Confidentiality Provision

23.     It is a violation of Defendant's Employment Agreement to misappropriate Ivy's confidential proprietary information. *See id.* ¶ 5. This includes distributing confidential proprietary information outside of Ivy or for any inappropriate purpose. *Id.*

24.     It is a violation of Ivy's employee policy to misappropriate Ivy confidential proprietary information. *See* Employee Handbook at 4. This includes distributing confidential proprietary information outside of Ivy or for an inappropriate purpose. *Id.*

25.     Defendant misappropriated a document entitled the "NEW Seton Call Route Nov 2009," by sending this highly sensitive document to her home email account on July 9, 2010. *See* July 9, 2010 Email (Ex. 3). This spreadsheet was created by Ivy based on its own analysis of referring physicians. The document categorizes physicians and set up a route for the Defendant to follow so that she visits office with a pre-determined frequency. This tool adds unique value to the services provided by Ivy to its customers.

26.     Defendant misappropriated the following Ivy documents, which contained confidential and proprietary information, by sending these highly sensitive documents to

8

her home email account on August 20, 2010, just two days after she gave notice of her

resignation to Ivy but while still an employee of Ivy:

- **Ivy Bubble Chart 5 Star Analysis Narrative** – This document explains and uses a proprietary methodology for analyzing the trends in exam referrals to Ivy's clients. This is a unique analysis that Ivy developed and Ivy is the only firm in its field that provides this type of analysis.

- **Ivy General Expectations** - A description of Ivy Management's expectations of each Sales and Marketing Representative, such as the Defendant. This includes Ivy's expectations for communication, approval of marketing material, and reporting.

- **Ivy Ghost Call Template** - Ghost calling clients and competitors is a unique activity that Ivy has developed over time, and is an activity that allows Ivy to account for its client's service level and the service level of its client's competition. This tool provides a template and guide on how to make ghost calls and a template for keeping track of ghost calls.

- **Ivy Ghost Shopping Form** - Similar to ghost calling (which is done via phone) Ivy also ghost shops its client and its client's competitors to get a first-hand impression of what it is like to be a patient at these facilities. This is a unique activity of Ivy's and one that Ivy has spent years to refine. The results of both ghost shopping and ghost calling are viewed as very valuable to Ivy and Ivy's clients.

- **Monthly Report Best Practices** - Ivy generates a monthly report for its clients summarizing Ivy's activity and performance. This document describes the content of that monthly report and gives tips and advice on how to make the monthly report impactful and meaningful to the client.

- **Monthly Report Best Practices Summary** - This is an example of an actual monthly report.

- **Sales and Marketing Representative** - This is the job description for the position that Defendant filled, including responsibilities.

- **Concierge Presentation** - This presentation describes a unique program that Ivy developed and uses at many of its clients. It is a program to help remove business barriers and enable smooth communication between referring offices and Ivy's clients. It is Ivy's "playbook" for pitching the idea to clients. Ivy uses it as a tool to both close deals with clients and to convince them that the investment in additional full time equivalent Ivy employees is worthwhile.

9

- Ivy Expense Form Sample - A spreadsheet (filled in for example purposes) used by all Ivy employees to get reimbursed for out of pocket expenses.

- Ivy Expense Form - A blank spreadsheet used by all Ivy employees to get reimbursed for out of pocket expenses.

- Vacation Request - A spreadsheet used by all Ivy employees to request vacation time off.

- Employee Handbook - This document describes in detail all of Ivy's human resource's policies and procedures.

- Ivy Letterhead Template - A blank document with Ivy branding that the employee can use for professional communications.

- Ivy Monthly Report Template - A blank document with Ivy branding that the employee can use to help contribute content to the Monthly Reports.

- Sample Representative Introduction Letter - A sample marketing piece that Ivy encourages each marketing representative to produce and distribute as a way of introducing them and the program to referring offices.

- Sales and Marketing Guide Diagnostic Test Final - This is a sales tool that Ivy developed that helps guide and prepare Sales and Marketing Representatives when calling on referring offices. It explains what type of physicians refer specific diagnostic imaging tests and the reason they would order those tests.

- 10 Critical Success Factors - This is an assessment framework that Ivy developed and is unique to Ivy. It is a method for grading the service level of Ivy's client and Ivy's client's competitors on ten key elements of delivering the diagnostic imaging service. This document is very helpful and valuable to both Ivy and its clients. It serves as a roadmap for implementing service level improvements.

- Probing Questions Referring Physicians - This is a sales tool that Ivy developed to help educate and guide Sales and Marketing Representatives when making calls on referring offices. It is designed to help them address a variety of service issues with different stakeholders in the referring office.

- Performance Appraisal Initial - This is a blank template used during Ivy's Performance Appraisal Process.

*See* August 20, 2010 email (Ex. 4).

10

27. Ivy believes Defendant sent all of these documents to her home email address in order to use Ivy's confidential and proprietary trade secrets and work product to set up her own competing business and to solicit Ivy's customers.

28. All of the documents misappropriated by Defendant to her personal email account were tools provided by her supervisor at a four day Ivy training, at Ivy's headquarters in Richmond, Virginia. These were tools provided by Ivy to Defendant to create value to the client and were developed by Ivy over the course of many years as it developed its business.

29. The documents misappropriated by Defendant to her personal email account represent a material portion of the analytical tools used to assess and measure client's metrics, all of which are confidential and proprietary information as defined in Defendant's Employment Agreement, *see* Employment Agreement ¶ 6, and in Ivy's Employee Handbook. *See* Employee Handbook at 4. The documents also include forms and documents that Defendant could need to set up her competing business to "hit the ground running."

### *Violations of the Non-Compete Provision and Breaches of Fiduciary Duty*

30. Incorporating all allegations previously set forth in this Complaint, Defendant began planning and taking active steps to compete against Ivy, in order to provide competitive services to current Ivy clients, well before the expiration of her Covenant Not to Compete provision within the Employment Agreement with Ivy.

31. Prior to the expiration of the Covenant Not to Compete provision in her Employment Agreement with Ivy, Defendant has been instrumental in encouraging both

11

customer(s) and employee(s) to terminate their relationship with Ivy and begin working with her in her competing venture.

32. On or about August 29, 2010, the Defendant left a voicemail for Sabrina Malcolmson, who is an employee of Ivy. *See* Affidavit of Sabrina Malcolmson ("Malcolmson Aff.") ¶ 5 (Ex. 5); *see also* 8/29/10 Voicemail CD and Transcript ("8/29/10 Voicemail") (collectively attached as Ex. 6). Malcolmson works for Ivy at O'Connor Hospital in San Jose, California, and she holds the same position at O'Connor that Defendant did at Seton, community educator and marketing manager. *See* Malcolmson Aff. ¶¶ 3-4. Both O'Connor and Seton were within the same hospital network – the Daughters of Charity Health System. *Id.*

33. In the voice message, Defendant indicated to Malcolmson that she was planning to "compete with Ivy," and specifically asked whether or not Malcolmson would be willing to come work for her if she took Ivy's "contract with O'Connor." *Id.* ¶ 5. Defendant offered to make Malcolmson an independent contractor and she would receive a salary of $100,000 if she left Ivy to come and work for Defendant's competing venture. *Id.*

*Violations of the Non-Solicitation of Clients Provision and Breaches of Fiduciary Duty*

34. Upon information and belief, prior to the expiration of the Non-Solicitation of Clients provision in her Employment Agreement, Defendant solicited and encouraged Ivy customers to terminate their relationship with Ivy and to begin contracting with her in her competing venture.

35. Defendant did this directly with solicitations and indirectly by making disparaging comments about Ivy to the customers.

12

36. Upon information and belief, Defendant was making disparaging comments about Ivy to representatives of Seton, with which Ivy had a Development Services Agreement and with whom Defendant worked directly on behalf of Ivy.

37. Upon information and belief, Defendant indicated to representatives at Seton that Ivy was unfairly compensating her.

38. Upon information and belief, Defendant indicated to representatives at Seton that if Ivy did not increase her compensation, she would discontinue her employment there and would compete against Ivy.

39. Based on the voicemail left by Defendant for Malcolmson, Defendant was, at a minimum, making plans to solicit Ivy's current client O'Connor, by stating that she would take Ivy's "contract with O'Connor." *See* Malcolmson Aff. ¶¶5, 8.

40. Defendant also asked Malcolmson to find out detailed information about who Ivy was replacing her with at Seton. *Id.* ¶¶ 14-15. Upon information and belief, Defendant did this to undermine her Ivy replacement, and Ivy's contract with Seton, by talking disparagingly about both to the people with whom she worked at Seton for Ivy.

## *Violations of the Non-Solicitation of Employees Provision and Breaches of Fiduciary Duty*

41. Prior to the expiration of the Non-Solicitation of Employees provision in her Employment Agreement, Defendant solicited and encouraged Ivy employee(s) to terminate their relationship with Ivy and to begin working for her in her competing venture.

42. Defendant did this directly with email, text and phone message solicitations and indirectly by making disparaging comments about Ivy to its employees.

13

43.   Defendant left a voicemail for Ivy employee Malcolmson, asking that she leave her employment with Ivy and come work for Defendant as a contractor, at Defendant's competing venture at a current Ivy customer, O'Connor. *See id.* ¶ 5; *see also* 8/27/10 Voicemail CD.

44.   Because Defendant knew Malcolmson's salary at Ivy, she knew how much money to offer her to make leaving Ivy and working for at a competing job look desirable. *Id.* ¶ 7.

45.   Defendant also solicited Ivy employees by encouraging them to question their pay at Ivy and by telling them they were not being fairly paid. Defendant complained to Malcolmson that she was not being compensated enough by Ivy and that Malcolmson too needed to know her rights. *See id.* ¶ 9; *see* 8/27/10 Voicemail CD; *see also* Texts Sent from Defendant to Malcolmson ("Texts") (Ex. 7).

46.   In one text message, Defendant sent to Malcolmson, entitled "Call n let me how," Defendant asked Malcolmson to call her and let her know how a meeting went with representatives of Ivy, and questioned Malcolmson whether or not Ivy would raise her salary. *See* Texts.

47.   Defendant also encouraged Ivy employees, such as Ms. Malcolmson, to breach their employment agreements with Ivy. For example, Defendant told Ms. Malcolmson via text message that the Non-Compete provision in her employment contract was void, indicating she did not have to abide by the provision. *See* Texts.

48.   In one text Defendant sent to Malcolmson entitled "On ur personal laptop. Google," she told her to look on her personal computer, not her Ivy computer, at

14

California labor law because the Covenant not to Compete within their Employment Agreements were allegedly "void in CA." *See* Texts; *see* Malcolmson Aff. ¶ 17.

49.     Defendant encouraged Malcolmson to discuss various issues with Ivy, including her salary and the enforceability of the Covenant Not to Compete, on Malcolmson's personal cell phone, personal computer and personal email account. *See* Malcolmson Aff. ¶ 16. Defendant was affirmatively hiding from Ivy the fact that she was talking disparagingly about Ivy to other employees, was attempting to solicit Malcolmson to a competitor of Ivy, was attempting to solicit customers to a competitor of Ivy, and was competing against Ivy. *Id.*

50.     Since her termination from Ivy on August 31, 2010, Defendant has continued to try and contact Malcolmson on several occasions in an attempt to get her to leave her job at Ivy and come work for Defendant in a competing venture. *Id.* ¶ 18.

## COUNT I: BREACH OF CONTRACT

51.     Ivy incorporates by reference the allegations previously set forth in this Complaint.

52.     The Employment Agreement executed by Defendant included a Covenant Not to Compete, a Non-Solicitation of Clients and a Non-Solicitation of Employees provisions prohibiting certain conduct before and one-year after her termination of employment with Ivy. The Non-Disclosure of Confidential Information provision in the Employment Agreement and the Confidentiality provision in the Employee Handbook prohibited certain conduct without temporal limitations.

53.     By engaging in the conduct set forth above, Defendant has breached her Employment Agreement with Ivy, including but not limited to the provisions relating to

15

not competing with Ivy at any time within one year of her termination of employment with Ivy.

54.    By engaging in the conduct set forth above, Defendant has breached her Employment Agreement with Ivy and the provisions within Employee Handbook, including but not limited to the provisions relating to the non-disclosure and non-use of Ivy's confidential customer and employee information, which was acknowledged as a trade secret and was misappropriated by Defendant.

55.    By engaging in the conduct set forth above, Defendant has breached her Employment Agreement with Ivy, including but not limited to the provisions relating to non-solicitation of Ivy customers, and the provisions relating to non-solicitation of Ivy employees.

56.    As a result of Defendant's breach of her Employment Agreement and the Employee Handbook, Ivy has suffered substantial damage to its business reputation and goodwill, loss of confidentiality over its proprietary customer and employee information, financial losses, and attorneys' fees in excess of the jurisdictional limit of this Court.

57.    Accordingly, Ivy is entitled to immediate equitable relief restraining further wrongful conduct by Defendant, as well as compensatory damages, and pursuant to the express terms of the Employment Agreement, recovery of all reasonable attorneys' fees and costs incurred in prosecuting these claims and obtaining relief from Defendant.

## COUNT II: Breach of Fiduciary Duty and Duty of Loyalty

58.    Ivy repeats the allegations asserted above.

59.    Defendant was an individual in whom Ivy placed special trust and confidence, and provided significant customer and employee oversight and employment duties.  As a

16

result, Defendant was provided with highly-sensitive confidential and proprietary information about existing Ivy customers and employees, was given the express approval and endorsement of Ivy officers and employees, and was provided unique access to those existing customers and employees in order to develop relationships, demonstrate her abilities, establish trust and reliance on her knowledge and judgments, and inform herself about the individual needs and decision-making issues that those customers and employees had.

60.     Accordingly, under Virginia law, Defendant owed Ivy a fiduciary duty to act at all times in Ivy's best interests and to promote Ivy's business.

61.     Defendant breached her fiduciary duties and duties of loyalty to Ivy including by, but not limited to:

> 1.    Planning, preparing and organizing to compete with Ivy's business while still employed by Ivy;
>
> 2.    Planning, preparing and organizing to solicit Ivy's customers and employees on behalf of her own competing business while still employed by Ivy;
>
> 3.    Actually soliciting Ivy's customers and employees on behalf of her own competing business while still employed by Ivy;
>
> 4.    Purposefully sabotaging current and potential Ivy contracts;
>
> 5.    Failing to disclose her knowledge of and involvement in the preparations for her competing business, and concealing her knowledge and involvement;
>
> 6.    Misappropriating Ivy's confidential information and trade secrets for the benefit of herself both before and after resignation from Ivy;
>
> 7.    Using Ivy's facilities, resources, personnel, trade secrets and confidential information in accomplishing the breaches set forth above.

17

62.     As a direct result of Defendant's breach of fiduciary duty and duty of loyalty, Ivy has suffered substantial damages.  Ivy has also suffered and will continue to suffer immediate damage and irreparable harm to its goodwill and business reputation.

63.     Defendant's breach of fiduciary duty and duty of loyalty was committed with reckless disregard for Ivy's rights.  Ivy is thus entitled to an award of punitive damages against her.

64.     Accordingly, Ivy is entitled to immediate equitable relief restraining further wrongful conduct by Defendant, as well as compensatory and punitive damages.

### COUNT III: Misappropriation of Trade Secrets and Confidential Information

65.     Ivy repeats the allegations asserted above.

66.     The information of Ivy known to Defendant constituted confidential and proprietary business information and trade secrets.

67.     Defendant knew she had an obligation to protect and maintain the secrecy of Ivy's proprietary business information and to use that information only for the benefit of Ivy.

68.     Ivy has made reasonable efforts to protect the confidentiality of its proprietary business, customer, and employee information.

69.     Defendant misappropriated Ivy's trade secrets and confidential and proprietary information in violation of the Virginia Uniform Trade Secrets Act, Va. Code Ann. §§ 59.1-336 - 343 (Michie 2000).  Moreover, Defendant has disclosed Ivy's trade secrets and confidential information, and the disclosure of such trade secrets and confidential information is inevitable as a result of her actions and plans.

70.     As a direct result of Defendant's misappropriation of Ivy's trade secrets and confidential information, Ivy has suffered substantial damages.  Ivy has also suffered and

18

will continue to suffer immediate damage and irreparable harm to its goodwill and business reputation.

71.     Ivy is therefore entitled to recover both the actual loss caused by the misappropriation as well as the unjust enrichment caused by the misappropriation pursuant to the Virginia Uniform Trade Secrets Act, Va. Code Ann. §§ 59.1-336 - 343 (Michie 2000).

72.     Defendant's misappropriation of Ivy's trade secrets and confidential information was done willfully and maliciously, so that Ivy is entitled to an award of exemplary damages against them in an amount constituting twice the compensatory damages, as well as recovery of Ivy's reasonable attorneys' fees, pursuant to the Virginia Uniform Trade Secrets Act, Va. Code Ann. §§ 59.1-336 - 343 (Michie 2000).

73.     Accordingly, Ivy is entitled to immediate equitable relief restraining further wrongful conduct by Defendant, as well as compensatory and exemplary damages, and an award of attorneys' fees and costs.

**COUNT IV: Tortious Interference with Existing and Prospective Business Relations**

74.     Ivy repeats the allegations asserted above.

75.     Defendant intentionally and improperly interfered, without justification, with Ivy's existing and prospective contracts and business relationships with its customers and employees when she solicited and induced Ivy customers and employees to terminate their business or employment relationships with Ivy and shift their business or employment to Ivy's direct competitor, Defendant's new competing business venture.

76.     As a direct result of Defendant's tortious interference with Ivy's existing and prospective contracts and business advantages, Ivy has suffered substantial damages. Ivy

19

has also suffered and will continue to suffer immediate damage and irreparable harm to its goodwill and business reputation.

77.     Defendant's tortious interference with Ivy's existing and prospective contracts and business advantages was done with gross negligence and reckless disregard to Ivy's rights, so that Ivy is entitled to an award of punitive damages against Defendant.

78.     Accordingly, Ivy is entitled to immediate equitable relief restraining further wrongful conduct by Defendant, as well as compensatory and punitive damages from Defendant jointly and severally.

## PRAYER FOR RELIEF

Accordingly, Ivy requests the following:

1.  A temporary injunction lasting until a permanent injunction hearing on this

    matter, and a permanent injunction enjoining Defendant from, directly or

    indirectly:

    (a)     using, disclosing or making available to anyone Ivy's confidential and proprietary information in violation of the Non-Disclosure of Confidential Information provision, including all confidential and proprietary information forwarded by Defendant to her personal email account, and an order requiring Defendant to return any and all of Ivy' confidential and proprietary information that she misappropriated;

    (b)     violating the Non-Solicitation of Clients provision, including (i) a prohibition on communication, soliciting or contacting in any way current or potential clients or customers, stating or implying that they should terminate or curtail its relationship with Ivy, or enter into a relationship with another person or entity to perform the services provided by Ivy; and (ii) a prohibition on making disparaging and/or defaming communications about Ivy, either verbally or in writing, to current or potential clients or customers;

    (c)     violating the Non-Solicitation of Employees provision, including (i) a prohibition on communication or contacting in any way current Ivy

20

9. All other relief to which Ivy may be entitled by law and equity.

Dated: September 10, 2010

Respectfully submitted,

Charles G. Meyer, III (VSB No. 34146)
Nancy B. Sasser (VSB No. 77283)
LeClairRyan
Riverfront Plaza, East Tower
951 East Byrd Street, Eighth Floor
Richmond, Virginia 23219
(804) 783-7579
Facsimile: (804) 783-7651
Charles.Meyer@leclairryan.com
Nancy.Sasser@leclairryan.com

- and -

*Of Counsel*
Benjamin C. Fultz
Jennifer Metzger Stinnett
FULTZ MADDOX HOVIOUS & DICKENS PLC
2700 National City Tower
Louisville, Kentucky 40202
(502) 588-2000
Facsimile: (502) 588-2020
bfultz@fmhd.com
jstinnett@fmhd.com

*Counsel for Plaintiff*

22

## **VERIFICATION**

COMMONWEALTH OF VIRGINIA    )
                                  )

COUNTY OF HENRICO               )

I, Douglas D. Wetmore, IV, being duly sworn upon oath, do hereby depose and says: (1) I am over twenty-one years old and believe in the obligation of an oath; (2) I am founder and principal of Ivy Ventures, LLC, and I am authorized to execute the foregoing Amended Verified Complaint on behalf of Ivy Ventures, LLC; and (3) to the best of my knowledge and belief, the factual allegations are true and accurate.

Douglas D. Wetmore, IV

COMMONWEALTH OF VIRGINIA

COUNTY OF HENRICO

Subscribed and sworn to before me
this 9th day of September, 2010.

Notary Public

My commission expires: 3/31/2014

23

## EMPLOYMENT AGREEMENT

THIS AGREEMENT is made as of the December 14, 2009, by and between IVY VENTURES, LLC, a Virginia limited liability company (the "Company"), and MYRA LYNN T. MARCELO ("Employee").

## RECITAL

A.     The Company is in the business of operating, managing, marketing and providing consulting services to hospitals, diagnostic imaging facilities and other outpatient services.

B.     The Company wishes to employ Employee as a community educator, and Employee has agreed to accept such employment, on the terms and conditions set forth herein.

## AGREEMENT:

In consideration of the following mutual and reciprocal promises and conditions, the parties agree as follows:

1.     **Employment.** The Company hereby employs Employee as a marketing representative and Employee agrees to be employed by the Company in such capacity. Employee acknowledges, as fully described in Section 5(b) of this Agreement, that continued employment with the Company requires Employee to take a test for the presence of illegal drugs in Employee's system within seven (7) days from the date Employee signs this Agreement. Employee agrees to devote all of Employee's professional time using Employee best efforts, attention and energies to the performance of the duties and responsibilities assigned to Employee from time to time by the Company.   Employee further agrees to comply with all of the Company's policies, standards, and regulations. Employee will not allow any other interest or pursuits to interfere with the performance of Employee's job duties and responsibilities for the Company.

2.     **Term.** The term of employment under this Agreement shall commence as of the date hereof, and it shall continue until terminated as provided in Sections 5(a) and 5(b) of this Agreement.

3.     **Duties.** Employee shall perform those duties assigned to Employee by the Company.

4.     **Compensation and Benefits.**

(a)     Compensation. In exchange for the faithful rendering of any and all services by Employee in any capacity hereunder, the Company shall pay Employee during the term of employment an annual base salary of Sixty Two Thousand Five Hundred dollars



**EXHIBIT**

**1**

($62,500.00) per year, payable in equal semi-monthly payments on the Company's regular semi-monthly pay dates, less applicable taxes and withholding.

Employee shall be further entitled to certain client longevity bonuses relating to (i) continued service by Employee at **Seton Medical Center ("Seton")** and (ii) the Company maintaining the existing contract with Seton (or renewals on substantially similar terms), provided Employee is still employed by Company on each of the dates such bonuses are payable and that Employee is not in breach of this Agreement. These longevity bonuses shall be earned as set forth in the table below:

| Date of Continued Service by Employee and Maintenance of Client Contract | Longevity Bonus |
|---|---|
| March 15, 2011 | $1,875 |
| June 15, 2011 | $1,875 |
| September 15, 2011 | $1,875 |
| December 15, 2011 | $1,875 |
| March 15, 2012 | $1,250 |
| June 15, 2012 | $1,250 |
| September 15, 2012 | $1,250 |
| December 15, 2012 | $1,250 |

Any earned client longevity bonuses will be paid to Employee in the paycheck immediately following the date such bonus is earned.

Additionally, Employee shall have the opportunity to earn quarterly performance-based compensation in accordance with Company designed incentive plans.

(b)     Benefits.  The Company shall provide Employee with (i) a $500.00 per month automobile allowance, (ii) health insurance benefits and (iii) other benefits as are provided to similar employees of the Company.  Employee may be required to pay a portion of health insurance or other benefits.

(c)     Reimbursement of Business Expenses.  The Company agrees to reimburse Employee for all reasonable, ordinary and necessary business expenses incurred by Employee for the benefit of the Company and at the direction and with the prior authorization of the Company.  The Company shall reimburse Employee upon submission to the Company of written, itemized accounts of such expenditures, together with receipts therefor.

(d)     Vacation, Sick Leave, Holidays and Tuition.  Employee shall earn (i) 4.61 hours of vacation time per semi-monthly pay period (120 hours total per year) and (ii) 1.67 hours of sick time per semi-monthly pay period (40 hours total per year).  Employee shall be entitled to holidays, and other benefits as provided to similar employees of the Company.

2

## 5.    Termination of Employment.

(a)    Termination by Either Party.  Either party may terminate this Agreement at any time, for any reason, with or without cause, upon thirty (30) days written notice to the other party.

(b)    Termination by the Company Based on Positive Drug or Alcohol Test.  In addition to the termination provisions as set forth in Section 5(a) of this Agreement, the Company may terminate this Agreement as follows:

(i)    Employee's continued employment with the Company requires Employee to take a test for the presence of illegal drugs in Employee's system within seven (7) days from the date Employee signs this Agreement. A positive test for certain illegal drugs and substances will result in the immediate termination of Employee's employment with the Company, and the Company will not be required to provide any written notice prior to such termination, nor will the Company be required to pay Employee any salary or benefits following the termination. Failure to take the test within the seven (7) days, refusing to take the test or sign the consent and authorization form for the test, tampering with the sample given, or giving an adulterated sample shall constitute a positive test.

(ii)    Employee has the continuing duty throughout the term of Employee's employment with the Company to comply with the Company's drug and alcohol use policy and drug testing policy (collectively, the "Policies") contained in the Employee Handbook. As a part of the Policies, Employee may be required to take additional tests for the presence of illegal drugs or alcohol in Employee's system. A positive test for certain illegal drugs or alcohol may result in discipline up to and including termination of Employee's employment with the Company. If the Company terminates Employee's employment with the Company for such a positive test, the Company will not be required to provide any written notice prior to such termination, nor will the Company be required to pay Employee any salary or benefits following the termination. Failure to take the test at the time and place designated by the Company, refusing to take the test or sign the consent and authorization form for the test, tampering with the sample given, or giving an adulterated sample shall constitute a positive test.

(c)    Payment Upon Termination.    Upon the termination of Employee's employment, Employee shall be entitled to receive (i) salary earned by Employee prior to termination, (ii) benefits through the date of termination, and (iii) reimbursement in accordance with Section 4(c) of properly documented and authorized expenses incurred prior to the date of termination.

## 6.    Non-Disclosure Of Confidential Information.

(a)    Employee agrees to hold and safeguard any information about the Company or any clients of the Company gained by Employee during the term of Employee's employment.    Employee shall not, without the prior written consent of the Company, misappropriate, disclose or make available to anyone for use outside the Company's organization at any time, either during Employee's employment or subsequent to any termination of Employee's employment, whether such termination is effected by Employee or the Company,

3

with or without cause, any such information about the Company or its clients, whether or not developed by Employee, except as required in the performance of Employee's duties for the Company.

(b)     Employee understands and agrees that any non-public information about the Company or its clients which Employee learned or obtained during the term of Employee's employment by the Company is the property of the Company and is essential to the protection of the Company's goodwill and to the maintenance of its competitive position and accordingly, must be kept secret.    Such information shall include, but not be limited to, information concerning the Company's, or any client's, services, service volume, marketing methods, marketing proposals, cost and pricing structures, volume information, service information, clients and prospective clients, identity of clients and prospective clients, identity of key contracting personnel in the employ of clients and prospective clients, amount or kind of service obtained from the Company, the Company's computer programs, system documentation, special hardware, products hardware, related software development, its manuals, formulae, processes, methods, machines, compositions, ideas, improvements, inventions, or other confidential or proprietary information belonging to the Company or relating to the Company's affairs or the affairs of its clients.

(c)     The parties acknowledge and agree that records, files, reports, manuals, handbooks, computer diskettes, computer software, customer files and information, documents, equipment and the like, relating to the Company's business, or its client's business, or which are developed for or by the Company, or which Employee shall develop, create, use, prepare or come into possession of during Employee's employment with the Company, shall remain the sole property of the Company and Employee covenants to promptly deliver to the Company any and all such property, and any copies thereof no later than the termination of Employee's employment with the Company.

(d)     Nothing in this Section 6 shall prohibit Employee from making any disclosure that is ordered by a court in any legal proceeding.

7.     **Covenant Not to Compete.**

Employee acknowledges that during the course of Employee's employment, Employee has obtained or will acquire confidential information about the Company's business and clients and that Employee may be responsible for contacting and developing relationships with the Company's customers. Accordingly;

(a)     Employee agrees that during the term of Employee's employment and for one (1) year following the termination of Employee's employment, whether such termination is effected by Employee or the Company, with or without cause, Employee will not, directly or indirectly, compete with the Company by providing or offering Competitive Services (as defined below) anywhere within fifteen (15) miles of the location of any Company client at which, or with respect to which, Employee provided services on behalf of the Company.

(b)     Employee agrees that the activities prohibited hereby shall include providing Competitive Services, either as an individual, as a partner, as a joint venturer with any

4

other person or entity, or as an employee, agent, director, officer, consultant, independent contractor or representative of any other person or entity, or otherwise being associated with any person or business entity that offers or provides Competitive Services.

(c)     For the purposes of this Agreement, "Competitive Services" shall mean services that are (i) substantially similar to the services provided by Employee to, or on behalf of, the Company while employed by the Company, and (ii) offered or provided to any person or entity that is engaged in the business of owning, operating, managing, marketing or providing consulting services to hospitals, diagnostic imaging facilities or other outpatient services.

(d)     Employee recognizes that, this covenant not to compete is of mutual benefit to the Company and Employee and is supported by full and adequate consideration including, but not limited to, the employment of Employee by the Company and the compensation described herein, and that the Company, as a result of successful operation and an investment of time and capital, has developed good will and earning power, that the restrictions and covenants set forth in this Agreement are reasonable and necessary for the protection of the Company's legitimate business interests and that the Company will suffer irreparable harm in the event of a breach by Employee of any of the foregoing provisions.

## 8.     Non-Solicitation Of Clients.

Employee agrees that during Employee's employment with the Company, Employee shall not, directly or indirectly, solicit the trade of, or trade with, any customer or prospective customer of the Company for any business purpose other than for the benefit of the Company. Employee further agrees that for one (1) year following termination of Employee's employment, whether such termination is effected by Employee or the Company, with or without cause, Employee shall not, directly or indirectly, as an owner, officer, director, employee, agent, representative, consultant or independent contractor: (a) solicit, contact, call upon, communicate with, or attempt to communicate with any Company client for the purpose of providing Competitive Services to such client, (b) sell, provide or divert any Competitive Services to any Company client, (c) perform or engage in any Competitive Services for any Company client, or (d) accept or receive any Company client for the purpose of providing any Competitive Services. "Company client" shall refer to: (1) any individual or entity that was a client of the Company within one year of Employee's termination or (2) any individual or entity that was solicited for business by the Company within one year of Employee's termination.

## 9.     Compliance with Client Policies.

Employee agrees to comply with all applicable policies of the Company's clients for which Employee provides services, including all policies relating to the confidentiality of patient medical information under the federal HIPAA Act and all other regulations.

## 10.     Non-Solicitation Of Employees.

Employee agrees that during Employee's employment with the Company and for one (1) year following termination of Employee's employment, whether such termination is effected by Employee or the Company, with or without cause, Employee shall not, directly or

5

indirectly, solicit or induce, or attempt to solicit or induce, any present or future employee of the Company to leave the Company for any reason whatsoever or hire any individual employed by the Company.

11.   **Injunctive Relief.**

(a)   Employee acknowledges that the remedies at law for any breach by Employee of any restrictive covenant contained in this agreement will be inadequate due to the potential for immediate and irreparable injury to the Company and that the Company shall be entitled to injunctive relief against Employee in addition to any other remedies available to the Company, including but not limited to, the recovery of damages from Employee.

(b)   Employee agrees that the obligations set forth in Sections 7, 8 and 9 contained herein shall be extended by the length of time which Employee shall have been in breach of any of the provisions. Employee recognizes that the time periods included in the restrictive covenants contained herein shall begin on the date a court of competent jurisdiction enters a final order enjoining Employee from violating such provisions unless good cause can be shown as to why the periods described should not begin at that time.

12.   **Reasonableness of Restraints.** It is the intention of the parties that the provisions of the restrictive covenants herein shall be enforceable to the fullest extent permissible under the applicable law. The parties agree that it is their intention that should any provision or subdivision of this Agreement, including, but not limited to, any aspect of the restraints or remedies imposed under Sections 6, 7, 8, 9 and 10 hereof, be found by a court of competent jurisdiction to be unreasonable or otherwise unenforceable, any such provision shall nevertheless be enforceable to the extent such court shall deem reasonable, and, in such event, it is the parties' intention, desire and request that the court reform such provision to the degree minimally necessary to render such provision, as reformed, reasonable and enforceable under applicable law.  In the event of such judicial reformation, the parties agree to be bound by this Agreement as reformed in the same manner and to the same extent as if they had agreed to such reformed agreement in the first instance.

13.   **Restrictive Covenants of the Essence.** The restrictive covenants of Employee set forth herein are of the essence of this Agreement; they shall be construed as independent of any other provision in this Agreement; and the existence of any claim or cause of action of Employee against the Company, whether predicated on this Agreement or not, shall not constitute a defense to the enforcement by the Company of the restrictive covenants contained herein. The Company shall at all times maintain the right to seek enforcement of these provisions whether or not the Company has previously refrained from seeking enforcement of any such provision as to Employee or any other person who has signed an agreement with similar provisions.

14.   **Governing Law.** The parties acknowledge and agree that this Agreement is made in the Commonwealth of Virginia, and that the interpretation and performance hereof shall be governed in all respects by the laws of the Commonwealth of Virginia, excluding its choice of law rules.

15.   **Severability.** Employee agrees that if any provision of this Agreement, or any portion thereof, shall be adjudged by any court of competent jurisdiction to be invalid or

unenforceable for any reason, such determination shall be confined to the operation of the provision at issue and shall not affect or invalidate any other provision of this Agreement and such court shall be empowered to substitute, to the extent enforceable, provisions similar thereto or other provisions so as to provide the Company to the fullest extent permitted by applicable law the benefits intended by such provisions.

16.     **Modifications; Waivers.**     This Agreement may be modified only by an instrument in writing signed by both parties. No waiver of the enforcement of any provisions of the Agreement shall be deemed a continuing waiver.

17.     **Assignability.**    The Agreement shall be assignable by the Company but not by Employee.     The obligations of Employee under this Agreement shall continue after the termination of Employee's employment with the Company; however such termination is effected, whether by Employee or the Company, with or without cause or notice, and shall be binding on Employee's heirs, executors, legal representatives, assigns and shall inure to the benefit of any successors or assigns of the Company. Employee specifically acknowledges that in the event of a sale of all or substantially all of the assets or stock of the Company, or any other event, merger, or transaction resulting in a change of ownership or control of the Company's business, the rights and obligations of the parties hereunder shall inure to the benefit of any such transferee, purchaser or future owner of the Company's business.     Employee specifically consents to the assignment by the Company of the Company's rights pursuant to Section 7, 8 and 9 of this Agreement protecting the Company from unfair competition.

18.     **Entire Agreement.** This Agreement sets forth the entire agreement of the parties with respect to the subject matter hereof.

19.     **Forum Selection.** The parties agree that the exclusive venue for the resolution of any dispute arising from the provisions of this Agreement shall lie with any court of competent jurisdiction in Henrico County, Virginia.

20.     **Attorney's Fees.** The parties agree that in the event of any breach or attempted breach by either party of any of the provisions of this Agreement, the other party shall be entitled to reimbursement of any costs or expenses, including but not limited to, reasonable attorney's fees, incurred by enforcing this Agreement.

21.     **Notices.** Any notice required or permitted to be given under this Agreement shall be considered as properly given if in writing and (a) delivered by hand, (b) sent by overnight courier, (c) mailed by registered or certified mail, return receipt requested and postage prepaid, or (d) sent by telex, facsimile, telecopy or email, in each case addressed as follows:

If to Company:

Ivy Ventures, LLC
7231 Forest Avenue, Suite 306
Richmond, VA 23226
804-862-1881 (fax)
rjohnson@ivyventures.com

7

If to Employee:

Myra Lynn T. Marcelo
383 King Street, #1016
San Francisco, CA 94158
650-430-1283 (cell)
myramarcelo1@yahoo.com

Delivery of any notice hereunder shall be effective only upon actual receipt thereof by the party
to whom such communication is directed. Either party to this Agreement may change the
address to which communications hereunder are to be directed by giving written notice to the
other party in the manner provided in this section.

IN WITNESS WHEREOF, the parties have affixed their signatures and seals as of the
date first above written.

**COMPANY:**

IVY VENTURES, LLC

By: _____

Name: K. Roger Johnson, Jr.
Title:  Manager

**EMPLOYEE:**

_____(SEAL)
Name: Myra Lynn T. Marcelo

8

**VIRGINIA:**

## IN THE CIRCUIT COURT OF HENRICO COUNTY

IVY VENTURES, LLC,                          )
Plaintiff,                                  )
                                            )
v.                                          ) Case No. 087 CL 10002539-00
                                            )
MYRA LYNN T. MARCELO,                       )
Defendant.                                  )

RECEIVED

SEP 10 2010

HENRICO CIRCUIT COURT OFFICE

---

## FIRST AMENDED VERIFIED COMPLAINT

---

Plaintiff, Ivy Ventures, LLC ("Ivy"), by counsel, submits its First Amended Verified Complaint against Defendant Myra Lynn T. Marcelo ("the Defendant"). Ivy seeks temporary and permanent injunctive relief to prevent the Defendant from further violations of her Employment Agreement with Ivy, which include the following provisions: (a) Non-Disclosure of Confidential Information, (b) Covenant Not to Compete, (c) Non-Solicitation of Clients, and (d) Non-Solicitation of Employees.

### NATURE OF THE ACTION

1.     This action arises out of the numerous breaches of fiduciary duty owed by Defendant to her former employer, Ivy, under Virginia common law, Virginia statutory law, and pursuant to the terms of her contractual agreements with Ivy.

### THE PARTIES

2.     Ivy is a Virginia limited liability company with its principal place of business in Richmond, Virginia.   Ivy provides operating, managing, marketing and consulting services to hospitals, diagnostic imaging facilities and other outpatient services.

3.     Upon information and belief, Defendant is a resident of San Francisco, California.

1

## JURISDICTION AND VENUE

4.    The Court has personal jurisdiction over Defendant because she has consented to such jurisdiction. *See* Employment Agreement (Ex. 1) ¶ 14 ("The parties acknowledge and agree that this Agreement is made in the Commonwealth of Virginia, and that the interpretation and performance hereof shall be governed in all respects by the laws of the Commonwealth of Virginia[.]").   Moreover, Defendant entered into the Employment Agreement in the Commonwealth of Virginia, and has conducted business in Virginia.

5.    Venue is proper in this Court because Defendant conducts business in this judicial district, the events giving rise to the Complaint occurred in this district, and Defendant agreed in her Employment Agreement that "the exclusive venue for the resolution of any dispute arising from the provisions of this Agreement shall lie with any court of competent jurisdiction in Henrico County, Virginia." *See id.* ¶ 19 ("Forum Selection").

## STATEMENT OF FACTS

### *Defendant's Employment Agreement with Ivy*

6.    On or about December 14, 2009, Ivy entered into an Employment Agreement with Defendant to employ her as a community educator, which included acting as marketing representative for imaging at one of Ivy's clients, Seton Medical Center in Daly City, California ("Seton").

7.    As conditions of the Employment Agreement, Defendant agreed to the following provisions: Non-Disclosure of Confidential Information, *see* Employment Agreement ¶ 6, a Covenant Not to Compete, *id.* ¶ 7, Non-Solicitation of Clients, *id.* ¶ 8, and Non-Solicitation of Employees. *Id.* ¶ 10.

2

8.    Defendant agreed to the Non-Disclosure of Confidential Information provision,

*id.* ¶ 6, which provides in relevant part that:

(a)    Employee agrees to hold and safeguard any information about the Company or any clients of the Company gained by Employee during the term of Employee's employment. Employee shall not, without the prior written consent of the Company, misappropriate, disclose or make available to anyone for use outside the Company's organization at any time, either during Employee's employment or subsequent to any termination of Employee's employment, whether such termination is effected by Employee or the Company, with or without cause, any such information about the Company or its clients, whether or not developed by Employee, except as required in the performance of Employee's duties for the Company.

(b)    Employee understands and agrees that any non-public information about the Company or its clients which Employee learned or obtained during the term of Employee's employment by the Company is the property of the Company and is essential to the protection of the Company's goodwill and to the maintenance of its competitive position and accordingly, must be kept secret. Such information shall include, but not be limited to, information concerning the Company's, or any client's, services, service volume, marketing methods, marketing proposals, cost and pricing structures, volume information, service information, clients and prospective clients, identity of clients and prospective clients, identity of key contracting personnel in the employ of clients and prospective clients, amount or kind of service obtained from the Company, the Company's computer programs, system documentation, special hardware, products hardware, related software development, its manuals, formulae, processes, methods, machines, compositions, ideas, improvements, inventions, or other confidential or proprietary information belonging to the Company or relating to the Company's affairs or the affairs of its clients.

(c) The parties acknowledge and agree that records, files, reports, manuals, handbooks, computer diskettes, computer software, customer files and information, documents, equipment and the like, relating to the Company's business, or its client's business, or which are developed for or by the Company, or which Employee shall develop, create, use, prepare or come into possession of during Employee's employment with the Company, shall remain the sole property of the Company and Employee covenants to promptly deliver to the Company any and all such property, and any copies thereof no later than the termination of Employee's employment with the Company.

3

9.    Defendant agreed to the Covenant Not to Compete provision, *id.* ¶ 7, which

provides in relevant part:

> Employee acknowledges that during the course of Employee's employment,
> Employee has obtained or will acquire confidential information about the
> Company's business and clients and that Employee may be responsible for
> contacting and developing relationships with the Company's customers.
> Accordingly,
>
> (a) Employee agrees that during the term of Employee's employment and for
> one (1) year following the termination of Employee's employment, whether
> such termination is effected by Employee or the Company, with or without
> cause, Employee will not, directly or indirectly, compete with the Company
> by providing or offering Competitive Services (as defined below) anywhere
> within fifteen (15) miles of the location of any Company client at which, or
> with respect to which, Employee provided services on behalf of the
> Company.
>
> (b) Employee agrees that the activities prohibited hereby shall include
> providing Competitive Services, either as an individual, as a partner, as a joint
> venturer with any other person or entity, or as an employee, agent, director,
> officer, consultant, independent contractor or representative of any other
> person or entity, or otherwise being associated with any person or business
> entity that offers or provides Competitive Services.
>
> (c) For the purposes of this Agreement, "Competitive Services" shall mean
> services that are (i) substantially similar to the services provided by Employee
> to, or on behalf of, the Company while employed by the Company, and (ii)
> offered or provided to any person or entity that is engaged in the business of
> owning, operating, managing, marketing or providing consulting services to
> hospitals, diagnostic imaging facilities or other outpatient services.
>
> (d) Employee recognizes that this covenant not to compete is of mutual
> benefit to the Company and Employee and is supported by full and adequate
> consideration including, but not limited to, the employment of Employee by
> the Company and the compensation described herein, and that the Company,
> as a result of successful operation and an investment of time and capital, has
> developed good will and earning power, that the restrictions and covenants
> set forth in this Agreement are reasonable and necessary for the protection of
> the Company's legitimate business interests and that the Company will suffer
> irreparable harm in the event of a breach by Employee of any of the foregoing
> provisions.

10.    Defendant agreed to the Non-Solicitation of Clients provision, *id.* ¶ 8, which

provides that:

4

Employee agrees that during Employee's employment with the Company, Employee shall not, directly or indirectly, solicit the trade of, or trade with, any customer or prospective customer of the Company for any business purpose other than for the benefit of the Company. Employee further agrees that for one (1) year following termination of Employee's employment, whether such termination is effected by Employee or the Company, with or without cause, Employee shall not, directly or indirectly, as an owner, officer, director, employee, agent, representative, consultant or independent contractor: (a) solicit, contact, call upon, communicate with, or attempt to communicate with any Company client for the purpose of providing Competitive Services to such client, (b) sell, provide or divert any Competitive Services to any Company client, (e) perform or engage in any Competitive Services for any Company client, or (d) accept or receive any Company client for the purpose of providing any Competitive Services. "Company client" shall refer to: (l) any individual or entity that was a client of the Company within one year of Employee's termination or (2) any individual or entity that was solicited for business by the Company within one year of Employee's termination.

11.    Defendant agreed to the Non-Solicitation of Employees provision, *id.* ¶ 10, which

provides:

Employee agrees that during Employee's employment with the Company and for one (l) year following termination of Employee's employment, whether such termination is effected by Employee or the Company, with or without cause, Employee shall not, directly or indirectly, solicit or induce, or attempt to solicit or induce, any present or future employee of the Company to leave the Company for any reason whatsoever or hire any individual employed by the Company.

12.    As a community educator and marketing representative, Defendant enjoyed a special position of trust and confidence with Ivy, which included the disclosure of non-public information about Ivy and its clients that was the property of Ivy, was essential to the protection of Ivy's goodwill and the maintenance of its competitive position, was confidential and proprietary, and, therefore, was required to be kept secret by Defendant both during and subsequent to any termination of her employment with Ivy. *See id.* ¶ 6(a)-(c).

5

13.   By agreeing to the Non-Disclosure of Confidential Information in the Employment Agreement, Defendant agreed that the information provided to her has a significant competitive and proprietary information and was extremely valuable to Ivy.

14.   As a result of the managerial positions with Ivy, Defendant was provided with highly sensitive confidential and proprietary information about existing Ivy customers and employees, and she was provided access to existing customers and employees in order to develop relationships and establish trust and reliance on their knowledge and judgments.   In fact, Ivy specifically trained the Defendant regarding all of this confidential and proprietary information, and introduced her to Ivy's client, based on an expectation that she would not breach her Employment Contract by misappropriating confidential trade secrets or client information that she was given access to do her job.

15.   During her time as an employee of Ivy, Defendant had daily contact with Ivy's customers and employees, developing experience and skills as a marketing representative of imaging.

16.   Defendant gained intimate knowledge of Ivy's customer and employee base, customer and employee lists and identities, employees' personal information, including email addresses and phone numbers, customer account information, customer agents and account managers, marketing methods, employee handbooks and manuals, written financial information, business plans, and other confidential and proprietary information not known to the general public (collectively referred to as "trade secrets"). All of the trade secrets Defendant knew or to which she had access were at all times deemed to be highly confidential by Ivy and by Defendant in her Employment Agreement.

6

17.     Defendant also agreed to maintain the confidentiality of any and all information regarding Ivy's clients, work done for Ivy's clients, and any information received in connection with such work for Ivy's clients, by agreeing to the confidentiality terms set out in Ivy's Employee Handbook. *See* Employee Handbook with Defendant's Signature at 4 (Ex. 2).

18.     Ivy made reasonable efforts to preserve the confidentiality of its trade secrets, including confidential customer and employee information, as exemplified by the Non-Disclosure of Confidential Information, Covenant Not to Compete, Non-Solicitation of Clients, and Non-Solicitation of Employees provisions, as well as the Confidentiality provision in the Employee Handbook, all of which Defendant specifically agreed to be obligated to maintain the confidentiality of Ivy's confidential trade information.

19.     Defendant also agreed that all of the restrictive covenants in her Employment Agreement with Ivy, including the Non-Disclosure of Confidential Information, Covenant Not to Compete, Non-Solicitation of Clients, and Non-Solicitation of Employees provisions, were reasonable and enforceable " to the fullest extent permissible under the applicable law." *See* Employment Agreement ¶ 12.

20.     As evidence of the valuable nature of the confidential information provided to Defendant, as well as the value Ivy placed on its relationships with its employees and customers, Defendant agreed that money damages would not be a sufficient remedy for any breach of the Non-Disclosure of Confidential Information, Covenant Not to Compete, Non-Solicitation of Clients, and Non-Solicitation of Employees provisions of the Employment Agreement. *See id.* ¶11.

7

21.     Therefore, upon any breach of the Non-Disclosure of Confidential Information, Covenant Not to Compete, Non-Solicitation of Clients, and Non-Solicitation of Employees provisions of the Employment Agreement by Defendant, Ivy could request injunctive relief in order to enforce or prevent any violations without proving actual damages. *Id.*

22.     Furthermore, upon any breach of the Employment Agreement by Defendant, Ivy could hold Defendant responsible for all costs and attorneys' fees spent to redress such a violation. *Id.* ¶ 20.

## *Violations of Confidentiality Provision*

23.     It is a violation of Defendant's Employment Agreement to misappropriate Ivy's confidential proprietary information. *See id.* ¶ 5. This includes distributing confidential proprietary information outside of Ivy or for any inappropriate purpose. *Id.*

24.     It is a violation of Ivy's employee policy to misappropriate Ivy confidential proprietary information. *See* Employee Handbook at 4. This includes distributing confidential proprietary information outside of Ivy or for an inappropriate purpose. *Id.*

25.     Defendant misappropriated a document entitled the "NEW Seton Call Route Nov 2009," by sending this highly sensitive document to her home email account on July 9, 2010. *See* July 9, 2010 Email (Ex. 3). This spreadsheet was created by Ivy based on its own analysis of referring physicians. The document categorizes physicians and set up a route for the Defendant to follow so that she visits office with a pre-determined frequency. This tool adds unique value to the services provided by Ivy to its customers.

26.     Defendant misappropriated the following Ivy documents, which contained confidential and proprietary information, by sending these highly sensitive documents to

8

her home email account on August 20, 2010, just two days after she gave notice of her

resignation to Ivy but while still an employee of Ivy:

- Ivy Bubble Chart 5 Star Analysis Narrative – This document explains and uses a proprietary methodology for analyzing the trends in exam referrals to Ivy's clients. This is a unique analysis that Ivy developed and Ivy is the only firm in its field that provides this type of analysis.

- Ivy General Expectations - A description of Ivy Management's expectations of each Sales and Marketing Representative, such as the Defendant. This includes Ivy's expectations for communication, approval of marketing material, and reporting.

- Ivy Ghost Call Template - Ghost calling clients and competitors is a unique activity that Ivy has developed over time, and is an activity that allows Ivy to account for its client's service level and the service level of its client's competition. This tool provides a template and guide on how to make ghost calls and a template for keeping track of ghost calls.

- Ivy Ghost Shopping Form - Similar to ghost calling (which is done via phone) Ivy also ghost shops its client and its client's competitors to get a first-hand impression of what it is like to be a patient at these facilities. This is a unique activity of Ivy's and one that Ivy has spent years to refine. The results of both ghost shopping and ghost calling are viewed as very valuable to Ivy and Ivy's clients.

- Monthly Report Best Practices - Ivy generates a monthly report for its clients summarizing Ivy's activity and performance. This document describes the content of that monthly report and gives tips and advice on how to make the monthly report impactful and meaningful to the client.

- Monthly Report Best Practices Summary - This is an example of an actual monthly report.

- Sales and Marketing Representative - This is the job description for the position that Defendant filled, including responsibilities.

- Concierge Presentation - This presentation describes a unique program that Ivy developed and uses at many of its clients. It is a program to help remove business barriers and enable smooth communication between referring offices and Ivy's clients. It is Ivy's "playbook" for pitching the idea to clients. Ivy uses it as a tool to both close deals with clients and to convince them that the investment in additional full time equivalent Ivy employees is worthwhile.

9

- Ivy Expense Form Sample - A spreadsheet (filled in for example purposes) used by all Ivy employees to get reimbursed for out of pocket expenses.

- Ivy Expense Form - A blank spreadsheet used by all Ivy employees to get reimbursed for out of pocket expenses.

- Vacation Request - A spreadsheet used by all Ivy employees to request vacation time off.

- Employee Handbook - This document describes in detail all of Ivy's human resource's policies and procedures.

- Ivy Letterhead Template - A blank document with Ivy branding that the employee can use for professional communications.

- Ivy Monthly Report Template - A blank document with Ivy branding that the employee can use to help contribute content to the Monthly Reports.

- Sample Representative Introduction Letter - A sample marketing piece that Ivy encourages each marketing representative to produce and distribute as a way of introducing them and the program to referring offices.

- Sales and Marketing Guide Diagnostic Test Final - This is a sales tool that Ivy developed that helps guide and prepare Sales and Marketing Representatives when calling on referring offices. It explains what type of physicians refer specific diagnostic imaging tests and the reason they would order those tests.

- 10 Critical Success Factors - This is an assessment framework that Ivy developed and is unique to Ivy. It is a method for grading the service level of Ivy's client and Ivy's client's competitors on ten key elements of delivering the diagnostic imaging service. This document is very helpful and valuable to both Ivy and its clients. It serves as a roadmap for implementing service level improvements.

- Probing Questions Referring Physicians - This is a sales tool that Ivy developed to help educate and guide Sales and Marketing Representatives when making calls on referring offices. It is designed to help them address a variety of service issues with different stakeholders in the referring office.

- Performance Appraisal Initial - This is a blank template used during Ivy's Performance Appraisal Process.

*See* August 20, 2010 email (Ex. 4).

10

27.     Ivy believes Defendant sent all of these documents to her home email address in order to use Ivy's confidential and proprietary trade secrets and work product to set up her own competing business and to solicit Ivy's customers.

28.     All of the documents misappropriated by Defendant to her personal email account were tools provided by her supervisor at a four day Ivy training, at Ivy's headquarters in Richmond, Virginia. These were tools provided by Ivy to Defendant to create value to the client and were developed by Ivy over the course of many years as it developed its business.

29.     The documents misappropriated by Defendant to her personal email account represent a material portion of the analytical tools used to assess and measure client's metrics, all of which are confidential and proprietary information as defined in Defendant's Employment Agreement, *see* Employment Agreement ¶ 6, and in Ivy's Employee Handbook. *See* Employee Handbook at 4. The documents also include forms and documents that Defendant could need to set up her competing business to "hit the ground running."

### *Violations of the Non-Compete Provision and Breaches of Fiduciary Duty*

30.     Incorporating all allegations previously set forth in this Complaint, Defendant began planning and taking active steps to compete against Ivy, in order to provide competitive services to current Ivy clients, well before the expiration of her Covenant Not to Compete provision within the Employment Agreement with Ivy.

31.     Prior to the expiration of the Covenant Not to Compete provision in her Employment Agreement with Ivy, Defendant has been instrumental in encouraging both

11

customer(s) and employee(s) to terminate their relationship with Ivy and begin working with her in her competing venture.

32. On or about August 29, 2010, the Defendant left a voicemail for Sabrina Malcolmson, who is an employee of Ivy. *See* Affidavit of Sabrina Malcolmson ("Malcolmson Aff.") ¶ 5 (Ex. 5); *see also* 8/29/10 Voicemail CD and Transcript ("8/29/10 Voicemail") (collectively attached as Ex. 6). Malcolmson works for Ivy at O'Connor Hospital in San Jose, California, and she holds the same position at O'Connor that Defendant did at Seton, community educator and marketing manager. *See* Malcolmson Aff. ¶¶ 3-4. Both O'Connor and Seton were within the same hospital network – the Daughters of Charity Health System. *Id.*

33. In the voice message, Defendant indicated to Malcolmson that she was planning to "compete with Ivy," and specifically asked whether or not Malcolmson would be willing to come work for her if she took Ivy's "contract with O'Connor." *Id.* ¶ 5. Defendant offered to make Malcolmson an independent contractor and she would receive a salary of $100,000 if she left Ivy to come and work for Defendant's competing venture. *Id.*

### *Violations of the Non-Solicitation of Clients Provision and Breaches of Fiduciary Duty*

34. Upon information and belief, prior to the expiration of the Non-Solicitation of Clients provision in her Employment Agreement, Defendant solicited and encouraged Ivy customers to terminate their relationship with Ivy and to begin contracting with her in her competing venture.

35. Defendant did this directly with solicitations and indirectly by making disparaging comments about Ivy to the customers.

12

36.     Upon information and belief, Defendant was making disparaging comments about Ivy to representatives of Seton, with which Ivy had a Development Services Agreement and with whom Defendant worked directly on behalf of Ivy.

37.     Upon information and belief, Defendant indicated to representatives at Seton that Ivy was unfairly compensating her.

38.     Upon information and belief, Defendant indicated to representatives at Seton that if Ivy did not increase her compensation, she would discontinue her employment there and would compete against Ivy.

39.     Based on the voicemail left by Defendant for Malcolmson, Defendant was, at a minimum, making plans to solicit Ivy's current client O'Connor, by stating that she would take Ivy's "contract with O'Connor." *See* Malcolmson Aff. ¶¶5, 8.

40.     Defendant also asked Malcolmson to find out detailed information about who Ivy was replacing her with at Seton. *Id.* ¶¶ 14-15. Upon information and belief, Defendant did this to undermine her Ivy replacement, and Ivy's contract with Seton, by talking disparagingly about both to the people with whom she worked at Seton for Ivy.

## *Violations of the Non-Solicitation of Employees Provision and Breaches of Fiduciary Duty*

41.     Prior to the expiration of the Non-Solicitation of Employees provision in her Employment Agreement, Defendant solicited and encouraged Ivy employee(s) to terminate their relationship with Ivy and to begin working for her in her competing venture.

42.     Defendant did this directly with email, text and phone message solicitations and indirectly by making disparaging comments about Ivy to its employees.

13

43.     Defendant left a voicemail for Ivy employee Malcolmson, asking that she leave her employment with Ivy and come work for Defendant as a contractor, at Defendant's competing venture at a current Ivy customer, O'Connor. *See id.* ¶ 5; *see also* 8/27/10 Voicemail CD.

44.     Because Defendant knew Malcolmson's salary at Ivy, she knew how much money to offer her to make leaving Ivy and working for at a competing job look desirable. *Id.* ¶ 7.

45.     Defendant also solicited Ivy employees by encouraging them to question their pay at Ivy and by telling them they were not being fairly paid. Defendant complained to Malcolmson that she was not being compensated enough by Ivy and that Malcolmson too needed to know her rights. *See id.* ¶ 9; *see* 8/27/10 Voicemail CD; *see also* Texts Sent from Defendant to Malcolmson ("Texts") (Ex. 7).

46.     In one text message, Defendant sent to Malcolmson, entitled "Call n let me how," Defendant asked Malcolmson to call her and let her know how a meeting went with representatives of Ivy, and questioned Malcolmson whether or not Ivy would raise her salary. *See* Texts.

47.     Defendant also encouraged Ivy employees, such as Ms. Malcolmson, to breach their employment agreements with Ivy. For example, Defendant told Ms. Malcolmson via text message that the Non-Compete provision in her employment contract was void, indicating she did not have to abide by the provision. *See* Texts.

48.     In one text Defendant sent to Malcolmson entitled "On ur personal laptop. Google," she told her to look on her personal computer, not her Ivy computer, at

14

California labor law because the Covenant not to Compete within their Employment Agreements were allegedly "void in CA." *See* Texts; *see* Malcolmson Aff. ¶ 17.

49. Defendant encouraged Malcolmson to discuss various issues with Ivy, including her salary and the enforceability of the Covenant Not to Compete, on Malcolmson's personal cell phone, personal computer and personal email account. *See* Malcolmson Aff. ¶ 16. Defendant was affirmatively hiding from Ivy the fact that she was talking disparagingly about Ivy to other employees, was attempting to solicit Malcolmson to a competitor of Ivy, was attempting to solicit customers to a competitor of Ivy, and was competing against Ivy. *Id.*

50. Since her termination from Ivy on August 31, 2010, Defendant has continued to try and contact Malcolmson on several occasions in an attempt to get her to leave her job at Ivy and come work for Defendant in a competing venture. *Id.* ¶ 18.

## COUNT I: BREACH OF CONTRACT

51. Ivy incorporates by reference the allegations previously set forth in this Complaint.

52. The Employment Agreement executed by Defendant included a Covenant Not to Compete, a Non-Solicitation of Clients and a Non-Solicitation of Employees provisions prohibiting certain conduct before and one-year after her termination of employment with Ivy. The Non-Disclosure of Confidential Information provision in the Employment Agreement and the Confidentiality provision in the Employee Handbook prohibited certain conduct without temporal limitations.

53. By engaging in the conduct set forth above, Defendant has breached her Employment Agreement with Ivy, including but not limited to the provisions relating to

15

not competing with Ivy at any time within one year of her termination of employment with Ivy.

54.     By engaging in the conduct set forth above, Defendant has breached her Employment Agreement with Ivy and the provisions within Employee Handbook, including but not limited to the provisions relating to the non-disclosure and non-use of Ivy's confidential customer and employee information, which was acknowledged as a trade secret and was misappropriated by Defendant.

55.     By engaging in the conduct set forth above, Defendant has breached her Employment Agreement with Ivy, including but not limited to the provisions relating to non-solicitation of Ivy customers, and the provisions relating to non-solicitation of Ivy employees.

56.     As a result of Defendant's breach of her Employment Agreement and the Employee Handbook, Ivy has suffered substantial damage to its business reputation and goodwill, loss of confidentiality over its proprietary customer and employee information, financial losses, and attorneys' fees in excess of the jurisdictional limit of this Court.

57.     Accordingly, Ivy is entitled to immediate equitable relief restraining further wrongful conduct by Defendant, as well as compensatory damages, and pursuant to the express terms of the Employment Agreement, recovery of all reasonable attorneys' fees and costs incurred in prosecuting these claims and obtaining relief from Defendant.

## COUNT II: Breach of Fiduciary Duty and Duty of Loyalty

58.     Ivy repeats the allegations asserted above.

59.     Defendant was an individual in whom Ivy placed special trust and confidence, and provided significant customer and employee oversight and employment duties. As a

16

result, Defendant was provided with highly-sensitive confidential and proprietary information about existing Ivy customers and employees, was given the express approval and endorsement of Ivy officers and employees, and was provided unique access to those existing customers and employees in order to develop relationships, demonstrate her abilities, establish trust and reliance on her knowledge and judgments, and inform herself about the individual needs and decision-making issues that those customers and employees had.

60.    Accordingly, under Virginia law, Defendant owed Ivy a fiduciary duty to act at all times in Ivy's best interests and to promote Ivy's business.

61.    Defendant breached her fiduciary duties and duties of loyalty to Ivy including by, but not limited to:

> 1.    Planning, preparing and organizing to compete with Ivy's business while still employed by Ivy;
>
> 2.    Planning, preparing and organizing to solicit Ivy's customers and employees on behalf of her own competing business while still employed by Ivy;
>
> 3.    Actually soliciting Ivy's customers and employees on behalf of her own competing business while still employed by Ivy;
>
> 4.    Purposefully sabotaging current and potential Ivy contracts;
>
> 5.    Failing to disclose her knowledge of and involvement in the preparations for her competing business, and concealing her knowledge and involvement;
>
> 6.    Misappropriating Ivy's confidential information and trade secrets for the benefit of herself both before and after resignation from Ivy;
>
> 7.    Using Ivy's facilities, resources, personnel, trade secrets and confidential information in accomplishing the breaches set forth above.

17

62.     As a direct result of Defendant's breach of fiduciary duty and duty of loyalty, Ivy has suffered substantial damages. Ivy has also suffered and will continue to suffer immediate damage and irreparable harm to its goodwill and business reputation.

63.     Defendant's breach of fiduciary duty and duty of loyalty was committed with reckless disregard for Ivy's rights. Ivy is thus entitled to an award of punitive damages against her.

64.     Accordingly, Ivy is entitled to immediate equitable relief restraining further wrongful conduct by Defendant, as well as compensatory and punitive damages.

### COUNT III: Misappropriation of Trade Secrets and Confidential Information

65.     Ivy repeats the allegations asserted above.

66.     The information of Ivy known to Defendant constituted confidential and proprietary business information and trade secrets.

67.     Defendant knew she had an obligation to protect and maintain the secrecy of Ivy's proprietary business information and to use that information only for the benefit of Ivy.

68.     Ivy has made reasonable efforts to protect the confidentiality of its proprietary business, customer, and employee information.

69.     Defendant misappropriated Ivy's trade secrets and confidential and proprietary information in violation of the Virginia Uniform Trade Secrets Act, Va. Code Ann. §§ 59.1-336 - 343 (Michie 2000). Moreover, Defendant has disclosed Ivy's trade secrets and confidential information, and the disclosure of such trade secrets and confidential information is inevitable as a result of her actions and plans.

70.     As a direct result of Defendant's misappropriation of Ivy's trade secrets and confidential information, Ivy has suffered substantial damages. Ivy has also suffered and

18

will continue to suffer immediate damage and irreparable harm to its goodwill and business reputation.

71.     Ivy is therefore entitled to recover both the actual loss caused by the misappropriation as well as the unjust enrichment caused by the misappropriation pursuant to the Virginia Uniform Trade Secrets Act, Va. Code Ann. §§ 59.1-336 - 343 (Michie 2000).

72.     Defendant's misappropriation of Ivy's trade secrets and confidential information was done willfully and maliciously, so that Ivy is entitled to an award of exemplary damages against them in an amount constituting twice the compensatory damages, as well as recovery of Ivy's reasonable attorneys' fees, pursuant to the Virginia Uniform Trade Secrets Act, Va. Code Ann. §§ 59.1-336 - 343 (Michie 2000).

73.     Accordingly, Ivy is entitled to immediate equitable relief restraining further wrongful conduct by Defendant, as well as compensatory and exemplary damages, and an award of attorneys' fees and costs.

**COUNT IV: Tortious Interference with Existing and Prospective Business Relations**

74.     Ivy repeats the allegations asserted above.

75.     Defendant intentionally and improperly interfered, without justification, with Ivy's existing and prospective contracts and business relationships with its customers and employees when she solicited and induced Ivy customers and employees to terminate their business or employment relationships with Ivy and shift their business or employment to Ivy's direct competitor, Defendant's new competing business venture.

76.     As a direct result of Defendant's tortious interference with Ivy's existing and prospective contracts and business advantages, Ivy has suffered substantial damages. Ivy

19

has also suffered and will continue to suffer immediate damage and irreparable harm to its goodwill and business reputation.

77.     Defendant's tortious interference with Ivy's existing and prospective contracts and business advantages was done with gross negligence and reckless disregard to Ivy's rights, so that Ivy is entitled to an award of punitive damages against Defendant.

78.     Accordingly, Ivy is entitled to immediate equitable relief restraining further wrongful conduct by Defendant, as well as compensatory and punitive damages from Defendant jointly and severally.

## PRAYER FOR RELIEF

Accordingly, Ivy requests the following:

1. A temporary injunction lasting until a permanent injunction hearing on this

    matter, and a permanent injunction enjoining Defendant from, directly or

    indirectly:

    (a)     using, disclosing or making available to anyone Ivy's confidential and proprietary information in violation of the Non-Disclosure of Confidential Information provision, including all confidential and proprietary information forwarded by Defendant to her personal email account, and an order requiring Defendant to return any and all of Ivy' confidential and proprietary information that she misappropriated;

    (b)     violating the Non-Solicitation of Clients provision, including (i) a prohibition on communication, soliciting or contacting in any way current or potential clients or customers, stating or implying that they should terminate or curtail its relationship with Ivy, or enter into a relationship with another person or entity to perform the services provided by Ivy; and (ii) a prohibition on making disparaging and/or defaming communications about Ivy, either verbally or in writing, to current or potential clients or customers;

    (c)     violating the Non-Solicitation of Employees provision, including (i) a prohibition on communication or contacting in any way current Ivy

20

employees, stating or implying that they should leave Ivy for any reason; and (ii) a prohibition on making disparaging and/or defaming communications about Ivy, either verbally or in writing, to current Ivy employees; and

(d)     violating the Covenant Not to Compete provision by, directly or indirectly, competing with Ivy by providing or offering Competitive Services anywhere within fifteen (15) miles of the location of any Ivy client at which, or with respect to which, Defendant provided services on behalf of the Ivy. Activities prohibited hereby shall include providing Competitive Services, either as an individual, as a partner, as a joint venturer with any other person or entity, or as an employee, agent, director, officer, consultant, independent contractor or representative of any other person or entity, or otherwise being associated with any person or business entity that offers or provides Competitive Services. "Competitive Services" shall mean services that are (i) substantially similar to the services provided by Employee to, or on behalf of, the Company while employed by the Company, and (ii) offered or provided to any person or entity that is engaged in the business of owning, operating, managing, marketing or providing consulting services to hospitals, diagnostic imaging facilities or other outpatient services.

2. An award of monetary relief against Defendant, including compensatory damages, punitive damages, and exemplary damages in an amount constituting twice the compensatory damages, pursuant to the Virginia Uniform Trade Secrets Act, Va. Code Ann. §§ 59.1-336 - 343 (Michie 2000);

3. Imposition of a constructive trust for the benefit of Ivy over all profits, advantages and payments received by Defendant by virtue of her wrongful acts;

4. For an accounting of all corporate opportunities usurped by Defendant;

5. An award of attorneys' fees and costs incurred in prosecuting this action, pursuant to Defendant's Employment Agreement;

6. All pre-judgment interest;

7. All post-judgment interest;

8. Trial by jury on all triable issues; and

21

9. All other relief to which Ivy may be entitled by law and equity.

Dated: September 10, 2010

Respectfully submitted,

*Nancy B. Sasser*

Charles G. Meyer, III (VSB No. 34146)
Nancy B. Sasser (VSB No. 77283)
LeClairRyan
Riverfront Plaza, East Tower
951 East Byrd Street, Eighth Floor
Richmond, Virginia 23219
(804) 783-7579
Facsimile: (804) 783-7651
Charles.Meyer@leclairryan.com
Nancy.Sasser@leclairryan.com

- and -

*Of Counsel*
Benjamin C. Fultz
Jennifer Metzger Stinnett
FULTZ MADDOX HOVIOUS & DICKENS PLC
2700 National City Tower
Louisville, Kentucky 40202
(502) 588-2000
Facsimile: (502) 588-2020
bfultz@fmhd.com
jstinnett@fmhd.com

*Counsel for Plaintiff*

22

## **VERIFICATION**

COMMONWEALTH OF VIRGINIA                  )
                                          )
COUNTY OF HENRICO                         )

I, Douglas D. Wetmore, IV, being duly sworn upon oath, do hereby depose and says: (1) I am over twenty-one years old and believe in the obligation of an oath; (2) I am founder and principal of Ivy Ventures, LLC, and I am authorized to execute the foregoing Amended Verified Complaint on behalf of Ivy Ventures, LLC; and (3) to the best of my knowledge and belief, the factual allegations are true and accurate.

Douglas D. Wetmore, IV

COMMONWEALTH OF VIRGINIA

COUNTY OF HENRICO

Subscribed and sworn to before me
this 9th day of September, 2010.

Notary Public

My commission expires: 3/31/2014

23

**VIRGINIA:**

**IN THE CIRCUIT COURT OF HENRICO COUNTY**

| | |
|---|---|
| **IVY VENTURES, LLC,** | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )     **Case No. CL10-2539** |
| | ) |
| **MYRA LYNN T. MARCELO,** | ) |
| | ) |
| Defendant. | ) |

## Affidavit of Myra Lynn T. Marcelo

I, Myra Lynn T. Marcelo, declare under penalty of perjury, under the laws of the State of California, that all statements contained in this application and any accompanying documents is true and correct. I hereby declare as follows:

1. I am the person named as the defendant in this action.

2. I am an adult citizen and resident in the city of San Francisco, California, a city in San Francisco County.

3. I have never worked, lived, or resided in Virginia.

4. Plaintiff Ivy Ventures, LLC ("Ivy") recruited, negotiated the terms of my employment, and hired me in

California on or about December 14, 2009. All of the recruitment, employment interviews and other action leading up to my employment with Ivy occurred solely in California; I did not contact Ivy in Virginia to seek employment.

5. During my life, my only contact or connection to Virginia is the fact that Ivy is based in Virginia; I have no other connection of any kind with Virginia. As of August 31, 2010, my last day of employment with Ivy, I have no connection with Virginia of any kind.

6. Ivy hired me to work at Seton Medical Center in Daly City, California. Daly City is a city in San Mateo County immediately South of San Francisco.

7. Ivy presented me with an Employment Agreement which I understood was Ivy's offer to employ me. I signed the Employment Agreement in California, accepting Ivy's offer and I became an employee of Ivy. Ivy has filed a copy of the Employment Agreement that I signed with this Court.

8. I have never performed services for any customer or client of Ivy other than Seton Medical Center in California; I have never performed services for any customer or client of Ivy in any state other than in California.

9.   I was, and Ivy treated me as, a California
employee subject to all of the laws of California; Ivy
withheld California income taxes from my pay and reported
my employment and earnings to the California Employment
Development Department.

10.   I gave notice of my resignation from my
employment with Ivy on August 18, 2010, because of a
dispute as to my appropriate compensation.

11.   I worked as an active employee of Ivy through
August 31, 2010.

12.   I have never at any time used any non-public
information or property of Ivy for any purpose other than
to perform services as an employee of Ivy during my
employment; I have no intention to use and I will not use
any non-public information or property of Ivy at any time
in the future.

13.   I have no documents of any kind in my possession
that, to my knowledge, contain any trade secret information
of Ivy.

14.   I have no intention to solicit any Ivy employee
to leave his or her employment with Ivy and I have not
caused any employee of Ivy to end his or her employment
relationship with Ivy

15. To date, Ivy has suffered no damage of any kind because of any act or omission of mine.

16. To date, Ivy retains a business relationship with O'Conner Hospital and Seton Medical Center and, other than ending my employment with Seton, I have done nothing to interfere in any way with the business relationship between Ivy and O'Conner or Seton.

17. I have received the professional advice of attorneys licensed to practice law in California that the anti-competition provisions of my Employment Agreement are void as a violation of California law as set forth in California Business and Professions Code § 16600 and applicable case law.

18. I object to a Virginia court exercising personal jurisdiction over me on the basis that such exercise of jurisdiction over me is a violation of my rights of due process guaranteed to me in the Constitution of the United States; I do not and never have waived any such Constitutional rights.

19. I never received a summons or a notice of complaint or any document to that effect, signed by the county clerk of Henrico County as an original or photocopy.

20. I am an individual of limited means and it would be a severe and unreasonable hardship on me to have to try

to defend a lawsuit in Virginia when I work and live in
California and all of the fact witnesses to any legal
dispute between me and Ivy are located in California.

Myra Lynn T. Marcelo

1    TOWNSEND AND TOWNSEND AND CREW LLP
     MARK T. JANSEN (State Bar No. 114896)
2    BYRON R. CHIN (State Bar No. 259846)
     Two Embarcadero Center Eighth Floor
3    San Francisco, CA 94111
     Telephone: (415) 576-0200
     Facsimile: (415) 576-0300
4    Email: mtjansen@townsend.com
          brchin@townsend.com
5
     Attorneys for Plaintiff
6    MYRA MARCELO

7
                    SUPERIOR COURT OF THE STATE OF CALIFORNIA
8
                        FOR THE COUNTY OF SAN FRANCISCO
9
                             UNLIMITED CIVIL CASE
10

11   MYRA MARCELO, an individual,          Case No. CGC 10-504554

12              Plaintiff,                  DECLARATION OF MYRA MARCELO IN
                                            SUPPORT OF *EX PARTE* APPLICATION FOR
13        v.                                ORDER TO SHOW CAUSE RE
                                            PRELIMINARY INJUNCTION AND FOR
14   IVY VENTURES, LLC, a Virginia          TEMPORARY RESTRAINING ORDER
     corporation
15
                Defendant.
16

17

18

19

20        I, Myra Marcelo, declare:

21        1.    I am the plaintiff in this action, and I have personal knowledge of each fact stated in

22   this declaration.

23        2.    I am an adult citizen and resident in the City and County of San Francisco,

24   California. My home address is 383 King Street, Apartment 916, San Francisco, California 94158.

25        3.    I have never worked, lived, or resided in Virginia. My only contact or connection to

26   Virginia throughout my life is the fact that Defendant Ivy Ventures, LLC ("Ivy") is based in

27   Virginia; I have no other connection of any kind with Virginia. As of August 31, 2010, my last day

28   of employment with Ivy, I have no connection with Virginia of any kind.

                                            - 1 -

4.    Ivy hired me to work as an on-site community educator and marketing representative at Seton Medical Center in Daly City, California. Daly City is a city in San Mateo County immediately South of San Francisco. Prior to being hired by Ivy, in December 2009, I had over eight (8) years experience as a community educator and in sales and marketing, including with respect to health care issues, from my previous career in the pharmaceutical industry and as a small business owner.

5.    Ivy recruited me, negotiated the terms of my employment, and hired me in California on or about December 14, 2009. All of the recruitment, employment interviews and other actions leading up to my employment with Ivy occurred solely in California; I did not contact Ivy in Virginia to seek employment.

6.    Specifically, I understand that Ivy, through William Kennedy of Garrison Co., Inc., posted an advertisement on the Medreps.com website for a Sales and Marketing position in the California section and within the San Francisco sub-section of the Medreps.com website. I viewed and responded to the advertisement as I was in search of a sales and/or marketing position in or around San Francisco, California, where I was living at the time. I interviewed telephonically with Mr. Kennedy while I was in the San Francisco Costco store on November 18, 2009. I then had a face-to-face interview with Mr. Robert Johnson, Ivy National Sales Manager on November 19, 2009. Mr. Johnson interviewed me at the Courtyard by Marriott hotel in South San Francisco. Mr. Johnson was in the San Francisco Bay Area interviewing local candidates to provide Sales and Marketing services to Seton Medical Center in Daly City. In addition, I was aware that several other Ivy representatives were in the San Francisco Bay Area on November 19, 2009, including Milan diPerro, Ivy's COO, and Barrett Clark, an Ivy analyst. Subsequently, on December 2, 2009, I interviewed with Seton Medical Center decision makers in the administrative office of Seton Medical Center. On December 3, 2009, I had a brief face-to-face interview with Milan diPierro, Ivy's COO at the Hampton Hotel in Daly City, California.

7.    On or about December 8, 2009, I received a phone call from Mr. Robert Johnson from Virginia to offer me the position. Mr. Johnson emailed me the Ivy Employment Agreement on December 10, 2009. I printed it out and reviewed it that evening at my apartment in San

- 2 -

DECLARATION OF MYRA LYNN T. MARCELO
CASE NO. CGC 10-504554

1     Francisco. I signed and mailed the agreement from San Francisco to Mr. Johnson on December 11,

2     2009. A true and correct copy of my employment agreement with Ivy, as subsequently signed by

3     Ivy is attached hereto as Exhibit 1. All of the terms in the agreement were provided as part of Ivy's

4     standard form agreement. I began employment with Ivy on December 14, 2009.

5          8.      I have never performed services for any customer or client of Ivy other than Seton

6     Medical Center in Daly City, California. I have never performed services for any customer or client

7     of Ivy in any state other than in California.

8          9.      Throughout my employment with Ivy, I was, and Ivy treated me as, a California

9     employee subject to all of the laws of California. For example, Ivy withheld California income

10    taxes from my pay and reported my employment and earnings to the California Employment

11    Development Department.

12         10.     My day-to-day activities under my employment agreement with Ivy were conducted

13    in my office at Seton Medical Center ("Seton"), the 1800 and 1850 Sullivan, 1500 Southgate and

14    801 Campus Drive buildings in Daly City, California. On a daily basis, I visited local physicians'

15    offices to increase imaging referrals to Seton Medical Center's Imaging Services Department. I

16    collected competitive market intelligence, decided and implemented the marketing plan, created the

17    collaterals for such plans. On a daily basis, I interacted with the technologists and radiologists in

18    CT and MRI in Seton's Imaging Department. Unhappy patients or doctors were referred to me, as I

19    was the point person for customer service. I was the liaison between Seton Hospital's departments

20    of Patient Access, Imaging, Lab, Administration, Surgery and Volunteer, the physicians' offices and

21    Ivy Ventures. Most action items were implemented by me as I was the only local and on-site Ivy

22    personnel at Seton.

23         11.     I gave notice of my resignation from my employment with Ivy on August 18, 2010,

24    because of a dispute as to my appropriate compensation. My salary was similar to the employees in

25    Virginia who had the same job responsibilities, but who lived in an area where the cost-of-living

26    was 40% less than that of San Francisco. I attempted to explain that the relative difference between

27    the Richmond, Virginia employees' salaries and a Richmond Virginia hospital receptionist was

28    approximately $30,000; while the relative value difference between my salary and a San Francisco

- 3 -

townsend.

1  hospital receptionist was approximately $0. Ivy was not open to recognizing the disparity between
2  what I was being paid and the cost of living in the San Francisco Bay Area; thus I was forced to
3  resign.

4          12.     I worked as an active employee of Ivy through August 31, 2010.

5          13.     On Saturday, September 11, 2010, I learned via an email that was sent to me by an
6  attorney purporting to represent Ivy, that Ivy had filed a complaint against me in the Virginia State
7  court (in Richmond, Virginia), for breach of the Employment Agreement and specifically to enforce
8  the non-competition provisions of the Agreement. I also learned that Ivy was asking the Virginia
9  state court to issue an order prohibiting me from competing with Ivy, or soliciting Seton Medical
10  Center or any other Ivy clients for business. A true and correct copy of the email I received on
11  Friday, September 10, 2010, with the attached complaint, request for injunctive relief and other
12  papers is attached hereto as Exhibit 2.

13          14.     I understand that the Virginia Court conducted a hearing on Monday, September 27,
14  2010, on Ivy's petition. Although I had not been properly served a summons and complaint, I
15  retained a Virginia attorney to make a special appearance contesting personal jurisdiction on my
16  behalf. A true and correct copy of the papers that I understand were filed on my behalf in the
17  Virginia proceeding are attached hereto as Exhibit 3.

18          15.     I did not attend the hearing in the Virginia proceeding, but understand that the Court
19  rejected my attorney's argument that I was not subject to personal jurisdiction in the Virginia
20  courts, and that the Court ruled that it would issue an order enforcing the non-competition
21  restrictions in the Employment Agreement. Although to date Ivy has not served upon me any court
22  order to this effect, my understanding that the order may have issued is preventing me from
23  exercising my rights as a California citizen to work in my chosen field and to compete for business,
24  including from Seton Medical Center and other health care providers in the San Francisco Bay
25  Area.

26          16.     To date and to my knowledge, Ivy retains a business relationship with O'Connor
27  Hospital and Seton Medical Center and, other than ending my employment with Seton, I have done
28  nothing to interfere in any way with the business relationship between Ivy and O'Connor or Seton.

- 4 -

townsend.   DECLARATION OF MYRA LYNN T. MARCELO
            CASE NO. CGC 10-504554

1       17.    Due to Ivy's enforcement of what I understand as unlawful anti-competitive clauses,

2  I have missed the opportunity to compete at O'Connor Hospital when Ivy's previous contract with

3  O'Connor expired on or about September 2010. Ivy's current contract with Seton Medical Center

4  ends in or about the month of October 2010.

5       18.    I presently intend to pursue a contract with Seton Medical Center to provide sales

6  and marketing services when its current contract with Ivy ends in or about the month of October

7  2010. It is important that I am able to compete for the Seton Medical Center contract. Having this

8  contract will allow the stability I need to build a business and to eventually hire employees in

9  California.

10      19.    I understand that Ivy is currently trying to convince Seton Medical Center to renew

11  its contract with Ivy when the contract is due for renewal in or around the end of October.

12      20.    If Ivy were allowed to enforce the non-compete and non-solicitation of clients

13  provisions of the Employment Agreement, it would severely deprive me of the ability to earn a

14  livelihood in my chosen profession.

15      21.    Specifically, I would be unable to pursue the contract with Seton Medical Center.

16  Without the opportunity to pursue this contract, I would be effectively prevented from obtaining

17  employment at Seton Medical Center for the next year as is the case with O'Connor Hospital.

18      22.    I believe that there is a high probability that Seton Medical Center would award the

19  contract to me, as their desire to continue to work with me is high. They have seen my work ethic,

20  my ability to cut red tape, my quick impact in the community as well as my fit with their Vincentien

21  values. I am also able to offer Seton Medical Center almost all that Ivy has to offer at a much lower

22  cost.

23      23.    Upon hearing the news of my departure, Michael Glasberg, Chief Operating Officer

24  of Seton told me that he was "not going to let me go as easily as he did his ex-wives." On another

25  occasion, he told me that if there were only a hundred more of me working at Seton, the hospital

26  would not be in the place that it is currently in. Mr. Glasberg's sentiment was relayed again to me

27  by the Medical Chief of Imaging, Adam Nevitt, MD, who has also given me high remarks.

28

- 5 -

townsend.  DECLARATION OF MYRA LYNN T. MARCELO

1       24.   Additionally, if Ivy is allowed to enforce the 15-mile radius zone of exclusion in

2 paragraph 7(a), it means the exclusion of a majority of the hospitals in the San Francisco Bay Area.

3 I would be deprived of the ability to earn a livelihood in my chosen profession as there are a total of

4 approximately 17 hospitals and over 10 independent imaging centers within the 30-total

5 longitudinal miles in the exclusionary zone. Attached hereto as Exhibit 4 is a true and correct copy

6 of a diagram representing my understanding of the size of the zone of exclusion around Seton and a

7 list of hospitals and imaging centers within the zone of exclusion. I created this diagram by taking a

8 snap shot of the area around Seton Medical Center when the distance scale measured 5-miles/10-

9 km. I then measured out a radius of 15-miles based on the scale from Seton. I created a red circle

10 that fit what should be a 15-mile radius and 30-mile diameter around Seton Medical Center. I then

11 listed the hospital and medical centers that I am familiar with from my previous career in the

12 pharmaceutical industry that are located within the zone of exclusion, which I confirmed on Google

13 Map. I then Googled search terms as "[City] + Independent Imaging Center", "[City] + MRI" etc. to

14 form the list of independent imaging centers. I made sure to visit their website and I excluded 3D

15 and 4D Ultra Sound Centers as they do not offer diagnostic imaging – these however may still be in

16 what Ivy considers as within their realm of business.

17       25.   More importantly, Ivy defines Clients as " … (1) any individual or entity that was a

18 client of the company within one year of employee's termination or (2) any individual or entity that

19 was solicited for business by the Company within one year of employee's termination." If Ivy is

20 allowed to enforce the Non Solicitation of Clients in paragraph 8, I am in effect unable to earn a

21 livelihood in my chosen profession anywhere in the United States and perhaps also in other

22 countries, as I have no knowledge of the Companies that Ivy solicited within the one year of my

23 termination.

24       26.   It is my understanding that Ivy is currently attempting to enforce these tortious anti-

25 competitive clauses as they have attempted services of process. My building's visitor log captured a

26 few visits to my apartment by a person who stated their reason for the visit as "Service". Recorded

27 attempts were on the following dates: September 24, September 25 and September 28, 2010.

28

-6-

DECLARATION OF MYRA LYNN T. MARCELO
CASE NO. CGC 10-504554

1    27.    California prides itself on its competitive landscape that has cultivated such

2    industries as that in Silicon Valley. I as a California resident would like to exercise those rights;

3    however, exercising those rights have proven impossible when a Virginia company and Court states

4    that I cannot practice those rights afforded to me as a California citizen.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- 7 -

DECLARATION OF MYRA LYNN T. MARCELO
CASE NO. CGC 10-504554

townsend.

1         I declare under penalty of perjury under the laws of the State of California that the

2    foregoing is true and correct.

3         Executed on October 11, 2010 at San Francisco California.

4

5    Dated: October 11, 2010

6                                  Myra Lynn T. Marcelo

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- 8 -

DECLARATION OF MYRA LYNN T. MARCELO
CASE NO. _____

townsend.

**VIRGINIA:**

**IN THE CIRCUIT COURT OF HENRICO COUNTY**

| | |
|---|---|
| **IVY VENTURES, LLC,** | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) **Case No. CL10-2539** |
| | ) |
| **MYRA LYNN T. MARCELO,** | ) |
| | ) |
| Defendant. | ) |

## Special Appearance; Defendant's Motion to Dismiss

Defendant Myra Lynn T. Marcelo (AMarcelo@), by counsel,

appears specially to move the denial of the motion for temporary

injunction of plaintiff Ivy Ventures, LLC ("Ivy") and the

dismissal of this action on the ground that this Court lacks

personal jurisdiction over Marcelo.

This Court lacks personal jurisdiction over Marcelo for two

distinct reasons: (1) Marcelo has not received service of

process; and (2) Marcelo lacks the "minimum contacts" with

Virginia necessary for this Court to exercise personal

jurisdiction over Marcelo.

Ivy has filed an Amended Complaint and a motion for

temporary injunction. Marcelo received a copy of the Complaint

and the motion on September 13, 2010. Ivy unilaterally scheduled

and noticed a hearing to take place before this Court on Monday,

-- 1 --

September 27, 2010, at 1:30 p.m.  On Tuesday, September 21, 2010,

Marcelo retained undersigned counsel to represent her in special

appearance only at the hearing on Monday, September 27, 2010.

### Questions Presented

1.  Has Marcelo been served with process so as to vest
    this Court with personal jurisdiction over her?

2.  Does this Court have personal jurisdiction over
    Marcelo, a California resident, who has no connection
    with Virginia but for her prior employment in
    California with Ivy Ventures, LLC, a Virginia company?

### Facts

The material facts are set forth in the Affidavit of

Marcelo, which is being filed with this motion to dismiss on

special appearance.

### Argument

1. This Court Lacks Jurisdiction Over Marcelo Because
   Marcelo Has Not Received Service of Process.

As explained factually in the Affidavit of Marcelo, Marcelo

has never received service of process.  Marcelo Aff. ¶ 19.  A

process server in California left a copy of the Complaint and other

papers on the door step of a residence in which Marcelo was present

on Monday, September 13, 2010.  The papers did not include a

Summons.  Marcelo has never received a Summons.  Marcelo Aff. ¶ 19.

The Proof of Service that Ivy has filed with this Court

establishes that no Summons was served or delivered to the door

step of the residence on September 13, 2010.

-- 2 --

In Lifestar Response of Maryland v. Vegosen, 267 Va. 720, 724, 594 S.E.2d 589, ___ (2004), the Virginia Supreme Court expressly held:

> Without either the notice prepared by the clerk or the copy of the motion for judgment, there is no notice of motion for judgment and no "process." It is the "process" which must reach the defendant to vest the court with jurisdiction. Without service of the "process," the court acquires no jurisdiction. A plaintiff who fails to serve a notice of motion for judgment on the defendant has failed to serve process and cannot benefit from the entry of a default judgment because the trial court never acquired jurisdiction over the defendant.

Under current procedure, the equivalent of the "notice" is the current "Summons." Marcelo has received no Summons. Consequently, in this case, no service of process had occurred and this Court has not acquired jurisdiction over Marcelo because of the lack of service of process.

**Lack of Personal Jurisdiction: "Minimum Contacts"**

This Court also lacks personal jurisdiction over Marcelo because Marcelo is a resident of California and has never worked, lived, or resided in Virginia. Marcelo has neither performed services nor conducted business activity in Virginia; nor has Marcelo promised to perform services or conduct business activity in Virginia. Marcelo lacks the sufficient or minimum contacts with Virginia to support personal jurisdiction under both the Virginia Along-arm@ statute, Virginia Code ' 8.01-328.1 and the

-- 3 --

due process requirements of the Constitution of the United

States.

> When a court assumes Along-arm@ jurisdiction
> over nonresidents, however, it must make a
> two-part analysis. First, the court must
> determine whether the statutory language
> purports to assert personal jurisdiction over
> the person subjected to process. Second,
> assuming that the statutory requirements have
> been satisfied, the court must determine
> whether the statutory assertion of personal
> jurisdiction is consistent with the due
> process clause of the Constitution of the
> United States. English Smith v. Metzger, 901
> F.2d 36 (4th Cir. 1990); Peanut Corp. of
> America v. Hollywood Brands, Inc., 696 F.2d
> 311 (4th Cir. 1982); Processing Research,
> Inc. v. Larson, 686 F. Supp. 119 (E.D. Va.
> 1988); see Omega Homes, Inc. v. Citicorp.
> Acceptance Co., 656 F. Supp. 393 (W.D. Va.
> 1987).

Opinion of the Attorney General 1992 Va. AG 14, 18 (1992).

## Statutory Language

Virginia Code ' 8.01-328.1 is the Along-arm@ statute

pursuant to which Ivy must establish personal jurisdiction over

Marcelo. None of the subsections of Virginia Code ' 8.01-328.1,

however, apply to Marcelo or her activities. If Ivy seeks to

claim that "long-arm" jurisdiction exists, then Ivy needs to

allege and prove facts sufficient to demonstrate that one or more

of the subsections of Virginia Code ' 8.01-328.1 is satisfied.

Nothing in the First Amended Complaint is a factual allegation

supporting the existence of "long-arm" jurisdiction in this case.

## ConstitutionalStandard -AM in um Contacts@

-- 4 --

Assuming a statutory basis for Along-arm@ jurisdiction over
Marcelo, which is denied, assertion of personal jurisdiction over
Marcelo under the facts of this case would violate Marcelo's due
process rights under the Fourteenth Amendment of the Constitution
of the United States.

The United States Supreme Court has explained the
constitutional standard as follows:

> In Shaffer v. Heitner we held that Aall
> assertions of state-court jurisdiction must
> be evaluated according to the standards set
> forth in International Shoe and its progeny.@
> 433 U.S., at 212. That is, a State may
> exercise jurisdiction over an absent
> defendant only if the defendant has Acertain
> minimum contacts with [the forum] such that
> the maintenance of the suit does not offend
> >traditional notions of fair play and
> substantial justice.=@ International Shoe Co.
> v. California, 326 U.S. 310, 316 (1945). In
> determining whether a particular exercise of
> state-court jurisdiction is consistent with
> due process, the inquiry must focus on Athe
> relationship among the defendant, the forum,
> and the litigation.@ Shaffer v. Heitner,
> supra, at 204.

Rush v. Savchuk, 444 U.S. 320, 327 (1980).

Marcelo submits that litigation of this lawsuit in Virginia
does Aoffend traditional notions of fair play and substantial
justice.@ Marcelo has not undertaken any Apurposeful activity@
in Virginia and it is fundamentally unfair to require Marcelo to
defend this action in Virginia.

Decisions such as WEB Equipment of Texas, Inc. v. Price, 49
Va. Cir. 134; 1999 Va. Cir. LEXIS 289 (Spotsylvania Cir.

1999)(copy attached), hold that the actual factual contacts between Marcelo and Virginia are insufficient for this Court to exercise personal jurisdiction over Marcelo. Accord Taylor v. Campabasso, 58 Va. Cir. 448, 2002 Va. Cir. LEXIS 62 (Spotsylvania Cir. 2002). WEB Equipment of Texas, Inc. v. Price presents facts very similar to the facts of this case. This case is like Price because Marcelo was never a resident of Virginia and she did not execute the Employment Agreement or any agreement in Virginia. It is clear that Marcelo has never conducted business or purposeful activity in Virginia and has no connection with Virginia whatever. All that Marcelo did was be hired in California to work in California. The fact that her employer happens to be a business headquartered in Virginia is not sufficient to subject her to suit in Virginia.

Can an Employment Agreement made in California between Marcelo, an individual California employee with no appreciable contacts with Virginia, and Ivy, her employer headquartered in Virginia, effect a waiver of Marcelo=s statutory and constitutional rights? The Virginia Supreme Court has not opined directly on this question. The Virginia Supreme Court did touch on this question, however, in PaulBusiness System s v.C anon U S A.,Inc., 240 Va. 337, 397 S.E.2d 804 (1990). The Court stated:

> According to the modern view, which we

-6-

> now embrace, contractual provisions limiting
> the place or court where potential actions
> between the parties may be brought are prima
> facie valid and should be enforced, <u>unless</u>
> <u>the party challenging enforcem entestablishes</u>
> <u>thatsuch provisions are unfairor</u>
> <u>unreasonable, orare affected by fraud or</u>
> <u>unequalbargaining power</u>    . [Emphasis added.]

Id. at 342.  The facts of this case establish that it is
Aunfair and unreasonable@ to require Marcelo to defend this
action in Virginia.  This action has nothing to do with anything
that happened in Virginia, nothing whatever.  This action
concerns what Marcelo has been doing and will continue to do in
California and whether her conduct violates any valid contractual
obligation that she had in her role as a California employee.
How can be it fair to force Marcelo to litigate in Virginia,
hiring Virginia trial counsel, and necessarily conduct discovery
in California in the course of the litigation, paying Virginia
counsel to travel across the country to California for trial
counsel here to undertake the necessary depositions and other
discovery in California.  The reality of this situation is
crystal clear - Ivy wants to cause Marcelo to suffer the
substantial loss of time and money that she necessarily will
incur if she must litigate in Virginia.  Ivy=s strategy is not
fair and it does not do justice.  This is particularly true when
under the laws of California the anti-competition provisions of
the Employment Agreement are void, in any event.  Ivy sued

-7-

Marcelo in Virginia not just to render her defense difficult to

impossible but because Ivy knows (or should know) that the non-

competition clauses it is asking this Court to enforce are

absolutely prohibited under California law. The non-compete and

anti-solicitation provisions may not only not be enforced in

California, but they are void ab into under California law. The

clauses never existed, because the protections for California

employees against these restraints may not be waived or avoided.

Additionally, with respect to the non-competition agreement,

California has a strong public interest in determining whether

any such attempted agreements can be enforced. California

Business and Professions Code § 16600 provides, for example, that

"every contract by which anyone is restrained from engaging in a

lawful profession, trade, or business of any kind is to that

extent void." As stated in a relatively recent case:

> California courts have held that this
> policy [as expressed § 16600] is sufficiently
> strong to override a contractual non-compete
> provision which designated another state's
> laws controlling. Application G roup, Inc. v.
> HunterG roup, Inc., 61 Cal. App.4th 881, 902,
> 72 Cal. Rptr. 2d 73 (Ct. App. 1998).

Sierra Environm entalTechs., Inc.v.Gale, 2010 U.S. Dist. LEXIS

22720 (E.D.Ca. March 10, 2010). In Application G roup, Inc.,

supra, the court would not enforce a choice of law provision that

arguably made a non-compete enforceable even when the employee

was originally a Maryland resident when he signed the contract

-8-

with a Maryland employer in Maryland.  The court still found the
non-compete void against public policy when the employee had
moved to California during the employment and had become a
California employee.  Id., review denied, Application Group, Inc.
v. Hunter Group, Inc., 1998 Cal. LEXIS 2968 (Cal. May 13, 1998).

     Marcelo respectfully submits that Virginia has zero interest
in this dispute.  Also, any idea that Ivy can more easily
litigate or more efficiently litigate this case in Virginia as
opposed to California, where the witnesses are and will be, is
simply unbelievable.  This action belongs in California because
of what is at issue.

     The public policy at stake here is clear.  Can companies
such as Ivy based in Henrico County, Virginia, force individual
employees such as Marcelo, who were employed and who are located
in California, to defend themselves in a courtroom located in
Henrico County, Virginia?  At least in the context of this
action, the answer should be and must be ANO@.

### Unfairness Is Reflected in Virginia Venue Law

     The fundamental unfairness and impropriety of subjecting
Marcelo to the jurisdiction of this Court is highlighted by the
fact that all of Marcelo=s allegedly improper conduct has
occurred in California.  Marcelo=s alleged acts in breach of
contract have occurred about three thousand miles from this
Court.  Ivy, however, attempts to invoke the equitable

-9-

jurisdiction of this Court to enjoin Marcelo=s alleged conduct about three thousand miles away.  Neither Virginia law nor the Constitution of the United States supports such an extension of this Court=s jurisdiction when Marcelo has no connection to Virginia.

Under Virginia law, an injunction action must be filed in a jurisdiction in which the person to be enjoined is located, which in this case is California.  Virginia Code ' 8.01-261(15)(c). It is fair and reasonable to require that the question whether or not a defendant=s conduct should be enjoined is the place in which the defendant would be enjoined.

As a practical matter, the crux of Ivy=s action against Marcelo is that Marcelo=s current and future actions in California violated or will violate the Employment Agreement attached to the Complaint as Exhibit 1 that Marcelo signed in California.  All the actions of Marcelo at issue in the litigation were taken or will be taken in California.  Marcelo and other material witnesses in any trial of this dispute are in California.  It also is undisputed that California has a strong public policy against enforcement of any covenant not to compete or other anti-competitive contractual provisions.  See California Code § 16600.

**WHEREFORE,** appearing specially, Marcelo asks that this Court dismiss this action and award her such other and further relief

as is proper.

Dated this 24th day of September, 2010.

Respectfully submitted,

MYRA LYNN T. MARCELO

By: _____

Counsel

David R. Simonsen, Jr. (VSB #20078)
Vickey A. Verwey (VSB #20267)
8003 Franklin Farms Drive, Suite 131
Richmond, Virginia 23229-5107
Tel: (804) 285-1337
Fax: (804) 285-1350
Email: DSimonsenJ@aol.com

Counsel for Plaintiff

### Certificate of Service

I certify that on this 24th day of September, 2010, a copy
of this motion was hand delivered to the office of Charles G.
Meyer, III, LeClairRyan, Riverfront Plaza, East Tower, 951 East
Byrd Street, Eighth Floor, Richmond, Virginia, 23219.

_____

-11-

**Ivy Ventures 15-mile zone of exclusion for Seton Medical Center (B)**



- Seton Medical Center

Hospitals

1. Kaiser San Francisco
2. UCSF
3. St. Lukes
4. CPMC Davies
5. CPMC California Pacific
6. CPMC California West
7. St. Mary's
8. St. Francis
9. Laguna Honda
10. Chinese Hospital
11. SF General
12. Kaiser Daly City
13. Peninsula
14. Mills
15. Alameda County Medical Center
16. Alta Bates Summit
17. Kaiser Oakland

Independent Imaging Centers

1. Premier Scan
2. Emeryville Advanced Imaging
3. RadNet – San Francisco
4. Norcal Imaging
5. VRI – San Mateo
6. UCSF Imaging Center – China Basin
7. Health Diagnostics – Daly City
8. Health Diagnostics – Sacramento St.
9. Health Diagnostics – Francisco St.
10. Health Diagnostics – Burligame
11. Peninsula MRI/US/Mammo

1   TOWNSEND AND TOWNSEND AND CREW LLP
    MARK T. JANSEN (State Bar No. 114896)
2   BYRON R. CHIN (State Bar No. 259846)
    Two Embarcadero Center Eighth Floor
3   San Francisco, CA  94111
    Telephone: (415) 576-0200
4   Facsimile: (415) 576-0300
    Email: mtjansen@townsend.com
5         brchin@townsend.com

6   Attorneys for Plaintiff
    MYRA MARCELO
7

8               SUPERIOR COURT OF THE STATE OF CALIFORNIA
9                   FOR THE COUNTY OF SAN FRANCISCO
10                        UNLIMITED CIVIL CASE
11

| | |
|---|---|
| 12  MYRA MARCELO, an individual, | Case No.  CGC 10-504554 |
| 13  Plaintiff, | *EX PARTE* APPLICATION FOR ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION |
| 14  v. | AND TEMPORARY RESTRAINING ORDER |
| 15  IVY VENTURES LLC, a Virginia corporation, | Date: October 13, 2010 Time: 9:30 a.m. |
| 16  Defendant. | (Ex parte calendar) Dept. No. 302 |
| 17 | Complaint Filed: October 12, 2010 Trial Date: None |
| 18 | |

19       Plaintiff, Myra Marcelo, hereby applies *ex parte* for:

20       (1) an Order to Show Cause as to why a preliminary injunction should not issue pending

21   trial in this action, enjoining Defendant Ivy Ventures LLC ("Ivy") and its employees, agents, and

22   persons acting with them or on their behalf, from enforcing in the state of California any out-of-

23   state judgment attempting to enforce paragraphs 7 and 8 of the Employment Agreement entered

24   into between Ivy and Plaintiff against acts that have occurred or will occur in California.

25       (2) a Temporary Restraining Order similarly restraining and enjoining Ivy and its

26   employees, agents, and persons acting with them or on their behalf, from enforcing in the state of

27   California any out of state judgment attempting to enforce paragraphs 7 and 8 of the Employment

28   Agreement against acts that have occurred or will occur in California.

- 1 -

1    This Application is made pursuant to the provisions of California Rule of Court 3.1150 and

2  Code of Civil Procedure § 527 on the ground that Plaintiff will suffer irreparable injury if

3  defendant is not enjoined from being able to enforce the prohibited terms against acts in California

4  because Plaintiff will be restrained from seeking lawful employment, thereby violating California

5  Business and Professions Code § 16600.  This Application is based upon the Memorandum in

6  Support and Declarations served herewith, and the verified Complaint in this action.

7    At the hearing set in the Order to Show Cause, Plaintiff will and hereby does move this

8  Court for a preliminary injunction similarly restraining and enjoining Ivy and its employees,

9  agents, and persons acting with them or on their behalf, from enforcing in the state of California

10  any out-of-state judgment enforcing paragraphs 7 and 8 of the Employment Agreement entered

11  into between Defendant and Plaintiff against acts that have occurred or will occur in California.

12  This Motion is and will be based upon this Application and the Memorandum in Support, the

13  verified Complaint in this action, Declarations and served herewith, and any responsive briefings

14  and arguments of counsel at the hearing of this Motion.

15    Proper notice of this *ex parte* application and motion was provided on October 12, 2010 to

16  Benjamin C. Fultz, Fultz Maddox Hovious & Dickens, LLP, 101 S. Fifth Street, 27th Floor,

17  Louisville, KY 40202-3116, tel. (502) 588-2016, who is counsel of record for Ivy in regard to the

18  suit for, *inter alia*, enforcement of paragraphs 7 and 8 of the Employment Agreement entered into

19  between Defendant and Plaintiff before the Circuit Court of Henrico County, Virginia, which suit

20  has led Plaintiff to file this court action seeking injunctive relief against the enforcement in the

21  state of California of any out of state judgment attempting to enforce of paragraphs 7 and 8 of the

22  Employment Agreement.  *See* Declaration of Notice, ¶ 4, filed herewith.

23  ///

24  ///

25  ///

26  ///

27  ///

28

- 2 -

1  DATED: October 12, 2010          Respectfully submitted,

2                                   TOWNSEND AND TOWNSEND AND CREW LLP

3

4                                   By:  _Byron Chin_____

5                                        MARK T. JANSEN
                                         BYRON CHIN

6                                        Attorneys for Plaintiff
                                         Myra Marcelo
7

8  62919213 v1

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- 3 -

townsend.

**VIRGINIA:**

**IN THE CIRCUIT COURT OF HENRICO COUNTY**

| | |
|---|---|
| **IVY VENTURES, LLC,** | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) **Case No. CL10-2539** |
| | ) |
| **MYRA LYNN T. MARCELO,** | ) |
| | ) |
| Defendant. | ) |

## Special Appearance; Defendant's Motion to Dismiss

Defendant Myra Lynn T. Marcelo (AMarcelo@), by counsel,
appears specially to move the denial of the motion for temporary
injunction of plaintiff Ivy Ventures, LLC ("Ivy") and the
dismissal of this action on the ground that this Court lacks
personal jurisdiction over Marcelo.

This Court lacks personal jurisdiction over Marcelo for two
distinct reasons: (1) Marcelo has not received service of
process; and (2) Marcelo lacks the "minimum contacts" with
Virginia necessary for this Court to exercise personal
jurisdiction over Marcelo.

Ivy has filed an Amended Complaint and a motion for
temporary injunction. Marcelo received a copy of the Complaint
and the motion on September 13, 2010. Ivy unilaterally scheduled
and noticed a hearing to take place before this Court on Monday,

-- 1 --

September 27, 2010, at 1:30 p.m. On Tuesday, September 21, 2010,

Marcelo retained undersigned counsel to represent her in special

appearance only at the hearing on Monday, September 27, 2010.

## Questions Presented

1. Has Marcelo been served with process so as to vest this Court with personal jurisdiction over her?

2. Does this Court have personal jurisdiction over Marcelo, a California resident, who has no connection with Virginia but for her prior employment in California with Ivy Ventures, LLC, a Virginia company?

## Facts

The material facts are set forth in the Affidavit of

Marcelo, which is being filed with this motion to dismiss on

special appearance.

## Argument

1. This Court Lacks Jurisdiction Over Marcelo Because Marcelo Has Not Received Service of Process.

As explained factually in the Affidavit of Marcelo, Marcelo

has never received service of process. Marcelo Aff. ¶ 19. A

process server in California left a copy of the Complaint and other

papers on the door step of a residence in which Marcelo was present

on Monday, September 13, 2010. The papers did not include a

Summons. Marcelo has never received a Summons. Marcelo Aff. ¶ 19.

The Proof of Service that Ivy has filed with this Court

establishes that no Summons was served or delivered to the door

step of the residence on September 13, 2010.

-- 2 --

In *Lifestar Response of Maryland v. Vegosen*, 267 Va. 720, 724, 594 S.E.2d 589, ___ (2004), the Virginia Supreme Court expressly held:

> Without either the notice prepared by the clerk or the copy of the motion for judgment, there is no notice of motion for judgment and no "process." It is the "process" which must reach the defendant to vest the court with jurisdiction. Without service of the "process," the court acquires no jurisdiction. A plaintiff who fails to serve a notice of motion for judgment on the defendant has failed to serve process and cannot benefit from the entry of a default judgment because the trial court never acquired jurisdiction over the defendant.

Under current procedure, the equivalent of the "notice" is the current "Summons." Marcelo has received no Summons. Consequently, in this case, no service of process had occurred and this Court has not acquired jurisdiction over Marcelo because of the lack of service of process.

### Lack of Personal Jurisdiction: "Minimum Contacts"

This Court also lacks personal jurisdiction over Marcelo because Marcelo is a resident of California and has never worked, lived, or resided in Virginia. Marcelo has neither performed services nor conducted business activity in Virginia; nor has Marcelo promised to perform services or conduct business activity in Virginia. Marcelo lacks the sufficient or minimum contacts with Virginia to support personal jurisdiction under both the Virginia Along-arm@ statute, Virginia Code ' 8.01-328.1 and the

-- 3 --

due process requirements of the Constitution of the United

States.

> When a court assumes Along-arm@ jurisdiction
> over nonresidents, however, it must make a
> two-part analysis. First, the court must
> determine whether the statutory language
> purports to assert personal jurisdiction over
> the person subjected to process. Second,
> assuming that the statutory requirements have
> been satisfied, the court must determine
> whether the statutory assertion of personal
> jurisdiction is consistent with the due
> process clause of the Constitution of the
> United States. English Smith v. Metzger, 901
> F.2d 36 (4th Cir. 1990); Peanut Corp. of
> America v. Hollywood Brands, Inc., 696 F.2d
> 311 (4th Cir. 1982); Processing Research,
> Inc. v. Larson, 686 F. Supp. 119 (E.D. Va.
> 1988); see Omega Homes, Inc. v. Citicorp.
> Acceptance Co., 656 F. Supp. 393 (W.D. Va.
> 1987).

Opinion of the Attorney General 1992 Va. AG 14, 18 (1992).

### Statutory Language

Virginia Code ' 8.01-328.1 is the Along-arm@ statute

pursuant to which Ivy must establish personal jurisdiction over

Marcelo. None of the subsections of Virginia Code ' 8.01-328.1,

however, apply to Marcelo or her activities. If Ivy seeks to

claim that "long-arm" jurisdiction exists, then Ivy needs to

allege and prove facts sufficient to demonstrate that one or more

of the subsections of Virginia Code ' 8.01-328.1 is satisfied.

Nothing in the First Amended Complaint is a factual allegation

supporting the existence of "long-arm" jurisdiction in this case.

### ConstitutionalStandard -AM inim um Contacts@

-- 4 --

Assuming a statutory basis for Along-arm@ jurisdiction over

Marcelo, which is denied, assertion of personal jurisdiction over

Marcelo under the facts of this case would violate Marcelo's due

process rights under the Fourteenth Amendment of the Constitution

of the United States.

The United States Supreme Court has explained the

constitutional standard as follows:

> In Shaffer v. Heitner we held that Aall
> assertions of state-court jurisdiction must
> be evaluated according to the standards set
> forth in International Shoe and its progeny.@
> 433 U.S., at 212. That is, a State may
> exercise jurisdiction over an absent
> defendant only if the defendant has Acertain
> minimum contacts with [the forum] such that
> the maintenance of the suit does not offend
> >traditional notions of fair play and
> substantial justice.=@ International Shoe Co.
> v. California, 326 U.S. 310, 316 (1945). In
> determining whether a particular exercise of
> state-court jurisdiction is consistent with
> due process, the inquiry must focus on Athe
> relationship among the defendant, the forum,
> and the litigation.@ Shaffer v. Heitner,
> supra, at 204.

Rush v. Savchuk, 444 U.S. 320, 327 (1980).

Marcelo submits that litigation of this lawsuit in Virginia

does Aoffend traditional notions of fair play and substantial

justice.@  Marcelo has not undertaken any Apurposeful activity@

in Virginia and it is fundamentally unfair to require Marcelo to

defend this action in Virginia.

Decisions such as WEB Equipment of Texas, Inc. v. Price, 49

Va. Cir. 134; 1999 Va. Cir. LEXIS 289 (Spotsylvania Cir.

-- 5 --

1999)(copy attached), hold that the actual factual contacts
between Marcelo and Virginia are insufficient for this Court to
exercise personal jurisdiction over Marcelo.  Accord Taylor v.
Campabasso, 58 Va. Cir. 448, 2002 Va. Cir. LEXIS 62 (Spotsylvania
Cir. 2002).  WEB Equipment of Texas, Inc. v. Price presents facts
very similar to the facts of this case.  This case is like Price
because Marcelo was never a resident of Virginia and she did not
execute the Employment Agreement or any agreement in Virginia.
It is clear that Marcelo has never conducted business or
purposeful activity in Virginia and has no connection with
Virginia whatever.  All that Marcelo did was be hired in
California to work in California.  The fact that her employer
happens to be a business headquartered in Virginia is not
sufficient to subject her to suit in Virginia.

　　　Can an Employment Agreement made in California between
Marcelo, an individual California employee with no appreciable
contacts with Virginia, and Ivy, her employer headquartered in
Virginia, effect a waiver of Marcelo=s statutory and
constitutional rights?  The Virginia Supreme Court has not opined
directly on this question.  The Virginia Supreme Court did touch
on this question, however, in PaulBusiness System s v.Canon
U S A., Inc., 240 Va. 337, 397 S.E.2d 804 (1990).  The Court
stated:

　　　　　　　　According to the modern view, which we

> now embrace, contractual provisions limiting
> the place or court where potential actions
> between the parties may be brought are prima
> facie valid and should be enforced, unless
> the party challenging enforcement establishes
> that such provisions are unfair or
> unreasonable, or are affected by fraud or
> unequal bargaining power        . [Emphasis added.]

Id. at 342.  The facts of this case establish that it is

Aunfair and unreasonable@ to require Marcelo to defend this

action in Virginia.  This action has nothing to do with anything

that happened in Virginia, nothing whatever.  This action

concerns what Marcelo has been doing and will continue to do in

California and whether her conduct violates any valid contractual

obligation that she had in her role as a California employee.

How can be it fair to force Marcelo to litigate in Virginia,

hiring Virginia trial counsel, and necessarily conduct discovery

in California in the course of the litigation, paying Virginia

counsel to travel across the country to California for trial

counsel here to undertake the necessary depositions and other

discovery in California.  The reality of this situation is

crystal clear - Ivy wants to cause Marcelo to suffer the

substantial loss of time and money that she necessarily will

incur if she must litigate in Virginia.  Ivy=s strategy is not

fair and it does not do justice.  This is particularly true when

under the laws of California the anti-competition provisions of

the Employment Agreement are void, in any event.  Ivy sued

-7-

Marcelo in Virginia not just to render her defense difficult to

impossible but because Ivy knows (or should know) that the non-

competition clauses it is asking this Court to enforce are

absolutely prohibited under California law.  The non-compete and

anti-solicitation provisions may not only not be enforced in

California, but they are void ab initio under California law.  The

clauses never existed, because the protections for California

employees against these restraints may not be waived or avoided.

Additionally, with respect to the non-competition agreement,

California has a strong public interest in determining whether

any such attempted agreements can be enforced. California

Business and Professions Code § 16600 provides, for example, that

"every contract by which anyone is restrained from engaging in a

lawful profession, trade, or business of any kind is to that

extent void."  As stated in a relatively recent case:

> California courts have held that this
> policy [as expressed § 16600] is sufficiently
> strong to override a contractual non-compete
> provision which designated another state's
> laws controlling. Application Group, Inc. v.
> Hunter Group, Inc., 61 Cal. App. 4th 881, 902,
> 72 Cal. Rptr. 2d 73 (Ct. App. 1998).

Siena Environmental Techs., Inc. v. Gale, 2010 U.S. Dist. LEXIS

22720 (E.D. Ca. March 10, 2010).  In Application Group, Inc.,

supra, the court would not enforce a choice of law provision that

arguably made a non-compete enforceable even when the employee

was originally a Maryland resident when he signed the contract

with a Maryland employer in Maryland. The court still found the non-compete void against public policy when the employee had moved to California during the employment and had become a California employee. Id., review denied, Application Group, Inc. v. Hunter Group, Inc., 1998 Cal. LEXIS 2968 (Cal. May 13, 1998).

Marcelo respectfully submits that Virginia has zero interest in this dispute. Also, any idea that Ivy can more easily litigate or more efficiently litigate this case in Virginia as opposed to California, where the witnesses are and will be, is simply unbelievable. This action belongs in California because of what is at issue.

The public policy at stake here is clear. Can companies such as Ivy based in Henrico County, Virginia, force individual employees such as Marcelo, who were employed and who are located in California, to defend themselves in a courtroom located in Henrico County, Virginia? At least in the context of this action, the answer should be and must be ANO@.

## Unfairness Is Reflected in Virginia Venue Law

The fundamental unfairness and impropriety of subjecting Marcelo to the jurisdiction of this Court is highlighted by the fact that all of Marcelo=s allegedly improper conduct has occurred in California. Marcelo=s alleged acts in breach of contract have occurred about three thousand miles from this Court. Ivy, however, attempts to invoke the equitable

jurisdiction of this Court to enjoin Marcelo=s alleged conduct about three thousand miles away. Neither Virginia law nor the Constitution of the United States supports such an extension of this Court=s jurisdiction when Marcelo has no connection to Virginia.

Under Virginia law, an injunction action must be filed in a jurisdiction in which the person to be enjoined is located, which in this case is California. Virginia Code ' 8.01-261(15)(c). It is fair and reasonable to require that the question whether or not a defendant=s conduct should be enjoined is the place in which the defendant would be enjoined.

As a practical matter, the crux of Ivy=s action against Marcelo is that Marcelo=s current and future actions in California violated or will violate the Employment Agreement attached to the Complaint as Exhibit 1 that Marcelo signed in California. All the actions of Marcelo at issue in the litigation were taken or will be taken in California. Marcelo and other material witnesses in any trial of this dispute are in California. It also is undisputed that California has a strong public policy against enforcement of any covenant not to compete or other anti-competitive contractual provisions. See California Code § 16600.

**WHEREFORE,** appearing specially, Marcelo asks that this Court dismiss this action and award her such other and further relief

as is proper.

Dated this 24th day of September, 2010.

Respectfully submitted,

MYRA LYNN T. MARCELO

By: _____

Counsel

David R. Simonsen, Jr. (VSB #20078)
Vickey A. Verwey (VSB #20267)
8003 Franklin Farms Drive, Suite 131
Richmond, Virginia 23229-5107
Tel: (804) 285-1337
Fax: (804) 285-1350
Email: DSimonsenJ@aol.com

Counsel for Plaintiff

### Certificate of Service

I certify that on this 24th day of September, 2010, a copy
of this motion was hand delivered to the office of Charles G.
Meyer, III, LeClairRyan, Riverfront Plaza, East Tower, 951 East
Byrd Street, Eighth Floor, Richmond, Virginia, 23219.

_____

1   TOWNSEND AND TOWNSEND AND CREW LLP
    MARK T. JANSEN (State Bar No. 114896)
2   BYRON R. CHIN (State Bar No. 259846)
    Two Embarcadero Center Eighth Floor
3   San Francisco, CA 94111
    Telephone: (415) 576-0200
4   Facsimile: (415) 576-0300
    Email: mtjansen@townsend.com
5        brchin@townsend.com

6   Attorneys for Plaintiff
    MYRA MARCELO
7

8          SUPERIOR COURT OF THE STATE OF CALIFORNIA

9              FOR THE COUNTY OF SAN FRANCISCO

10                    UNLIMITED CIVIL CASE

| | |
|---|---|
| 11  MYRA MARCELO, an individual, | Case No. CGC 10-504554 |
| 12  Plaintiff, | *[PROPOSED]* TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION |
| 13  v. | |
| 14  IVY VENTURES, LLC, a Virginia corporation | Date: October 13, 2010 Time: 9:30 a.m. |
| 15 | (Ex parte calendar) Dept. No. 302 |
| 16  Defendant. | Complaint Filed: October 12, 2010 Trial Date: None |

17                    **ORDER TO SHOW CAUSE**

18

19       To Defendant Ivy Ventures LLC:

20       1.       Based upon the verified complaint filed in this action and on the declaration of

21   Plaintiff Myra Marcelo, you are ordered to appear on _____ at

22   _____ in Department _____ of this Court located at 400 McAllister Street,

23   San Francisco, CA 94102 to show cause why a preliminary injunction should not issue pending

24   trial in this action, restraining and enjoining you and your employees and agents, and any other

25   persons acting with you or in your behalf from enforcing in the state of California any out-of-state

26   judgment attempting to enforce paragraphs 7 and 8 of the Employment Agreement entered into

27   between you and Plaintiff against acts that have occurred or will occur in California.

28

- 1 -

townsend.

1    **TEMPORARY RESTRAINING ORDER**

2    2.    Pending hearing on the Order to Show Cause, you, your employees and agents, and

3    any other persons acting with you or in your behalf are restrained and enjoined from enforcing in

4    the state of California any out-of-state judgment attempting to enforce paragraphs 7 and 8 of the

5    Employment Agreement entered into between you and Plaintiff against acts that have occurred or

6    will occur in California.

7    3.    This Order to Show Cause and Temporary Restraining Order and supporting papers

8    shall be served on Defendant no later than _____ by _____.

9    Proof of such service shall be filed at least _____ court days prior to the hearing.

10    4.    Any opposition papers to the Order to Show Cause shall be filed and served on

11    plaintiff by _____ no later than _____.

12    Any reply papers to the opposition shall be filed and served on defendant by

13    _____ no later than _____.

14    5.    The restraining order granted herein shall expire on _____.

15

16

17

18

19    Dated:_____

20                                    Judge of the Superior Court

21    62919231 v1

22

23

24

25

26

27

28

- 2 -

townsend.